# Exhibit 1



**Superior Court of the District of Columbia**
CIVIL DIVISION
Civil Actions Branch
500 Indiana Avenue, N.W., Suite 5000 Washington, D.C. 20001
Telephone: (202) 879-1133 Website: www.dccourts.gov


RECEIVED
JAN 0 4 2019
BY: .........................

KRS Processing Inc (KathyAllen President)
_____
                        Plaintiff
        vs.

Kevin Goldberg Fletcher Heald HildrethPLC
_____
                        Defendant

Case Number   2018 CA 008468 B

### SUMMONS

To the above named Defendant:

You are hereby summoned and required to serve an Answer to the attached Complaint, either personally or through an attorney, within twenty one (21) days after service of this summons upon you, exclusive of the day of service. If you are being sued as an officer or agency of the United States Government or the District of Columbia Government, you have sixty (60) days after service of this summons to serve your Answer. A copy of the Answer must be mailed to the attorney for the plaintiff who is suing you. The attorney's name and address appear below. If plaintiff has no attorney, a copy of the Answer must be mailed to the plaintiff at the address stated on this Summons.

You are also required to file the original Answer with the Court in Suite 5000 at 500 Indiana Avenue, N.W., between 8:30 a.m. and 5:00 p.m., Mondays through Fridays or between 9:00 a.m. and 12:00 noon on Saturdays. You may file the original Answer with the Court either before you serve a copy of the Answer on the plaintiff or within seven (7) days after you have served the plaintiff. If you fail to file an Answer, judgment by default may be entered against you for the relief demanded in the complaint.

KRS Processing Inc (KathyAllen President) -PRO SE
_____
Name of Plaintiff's Attorney

26 55th Street NE
_____
Address
Washington, DC 20019
_____

(202) 396-1225
_____
Telephone

Clerk of the Court

By _____

Date _____12/10/2018_____

如需翻译,请打电话 (202) 879-4828     Veuillez appeler au (202) 879-4828 pour une traduction     Để có một bài dịch, hãy gọi (202) 879-4828
번역을 원하시면, (202) 879-4828로 전화주십시오     ናትreferences ትርጉም ለማግኘት (202) 879-4828 ይደውሉ

IMPORTANT: IF YOU FAIL TO FILE AN ANSWER WITHIN THE TIME STATED ABOVE, OR IF, AFTER YOU ANSWER, YOU FAIL TO APPEAR AT ANY TIME THE COURT NOTIFIES YOU TO DO SO, A JUDGMENT BY DEFAULT MAY BE ENTERED AGAINST YOU FOR THE MONEY DAMAGES OR OTHER RELIEF DEMANDED IN THE COMPLAINT. IF THIS OCCURS, YOUR WAGES MAY BE ATTACHED OR WITHHELD OR PERSONAL PROPERTY OR REAL ESTATE YOU OWN MAY BE TAKEN AND SOLD TO PAY THE JUDGMENT. IF YOU INTEND TO OPPOSE THIS ACTION, *DO NOT FAIL TO ANSWER WITHIN THE REQUIRED TIME.*

If you wish to talk to a lawyer and feel that you cannot afford to pay a fee to a lawyer, promptly contact one of the offices of the Legal Aid Society (202-628-1161) or the Neighborhood Legal Services (202-279-5100) for help or come to Suite 5000 at 500 Indiana Avenue, N.W., for more information concerning places where you may ask for such help.

See reverse side for Spanish translation
Vea al dorso la traducción al español

CV-3110 [Rev. June 2017]

Super. Ct. Civ. R. 4



**SUPERIOR COURT OF THE DISTRICT OF COLUMBIA**
**CIVIL DIVISION**
Civil Actions Branch
500 Indiana Avenue, N.W., Suite 5000, Washington, D.C. 20001
Telephone: (202) 879-1133 • Website: www.dccourts.gov

KRS PROCESSING, INC
    Vs.
AMERICAN SOCIETY OF COMPOSERS et al          C.A. No.     2018 CA 008468 B

## INITIAL ORDER AND ADDENDUM

Pursuant to D.C. Code § 11-906 and District of Columbia Superior Court Rule of Civil Procedure ("Super. Ct. Civ. R.") 40-I, it is hereby **ORDERED** as follows:

(1) Effective this date, this case has assigned to the individual calendar designated below. All future filings in this case shall bear the calendar number and the judge's name beneath the case number in the caption. On filing any motion or paper related thereto, one copy (for the judge) must be delivered to the Clerk along with the original.

(2) Within 60 days of the filing of the complaint, plaintiff must file proof of serving on each defendant: copies of the summons, the complaint, and this Initial Order and Addendum. As to any defendant for whom such proof of service has not been filed, the Complaint will be dismissed without prejudice for want of prosecution unless the time for serving the defendant has been extended as provided in Super. Ct. Civ. R. 4(m).

(3) Within 21 days of service as described above, except as otherwise noted in Super. Ct. Civ. R. 12, each defendant must respond to the complaint by filing an answer or other responsive pleading. As to the defendant who has failed to respond, a default and judgment will be entered unless the time to respond has been extended as provided in Super. Ct. Civ. R. 55(a).

(4) At the time and place noted below, all counsel and unrepresented parties shall appear before the assigned judge at an initial scheduling and settlement conference to discuss the possibilities of settlement and to establish a schedule for the completion of all proceedings, including, normally, either mediation, case evaluation, or arbitration. Counsel shall discuss with their clients **prior** to the conference whether the clients are agreeable to binding or non-binding arbitration. **This order is the only notice that parties and counsel will receive concerning this Conference.**

(5) Upon advice that the date noted below is inconvenient for any party or counsel, the Quality Review Branch (202) 879-1750 may continue the Conference **once**, with the consent of all parties, to either of the two succeeding Fridays. Request must be made not less than seven business days before the scheduling conference date.
No other continuance of the conference will be granted except upon motion for good cause shown.

(6) Parties are responsible for obtaining and complying with all requirements of the General Order for Civil cases, each judge's Supplement to the General Order and the General Mediation Order. Copies of these orders are available in the Courtroom and on the Court's website http://www.dccourts.gov/.

Chief Judge Robert E. Morin

Case Assigned to: Judge BRIAN F HOLEMAN
Date:  December 10, 2018
Initial Conference: 9:30 am, Friday, March 08, 2019
Location:  Courtroom 516
          500 Indiana Avenue N.W.
          WASHINGTON, DC  20001

CAIO-60

## ADDENDUM TO INITIAL ORDER AFFECTING
## ALL MEDICAL MALPRACTICE CASES

In accordance with the Medical Malpractice Proceedings Act of 2006, D.C. Code § 16-2801, et seq. (2007 Winter Supp.), "[a]fter an action is filed in the court against a healthcare provider alleging medical malpractice, the court shall require the parties to enter into mediation, without discovery or, if all parties agree[,] with only limited discovery that will not interfere with the completion of mediation within 30 days of the Initial Scheduling and Settlement Conference ("ISSC"), prior to any further litigation in an effort to reach a settlement agreement. The early mediation schedule shall be included in the Scheduling Order following the ISSC. Unless all parties agree, the stay of discovery shall not be more than 30 days after the ISSC." D.C. Code § 16-2821.

To ensure compliance with this legislation, on or before the date of the ISSC, the Court will notify all attorneys and *pro se* parties of the date and time of the early mediation session and the name of the assigned mediator. Information about the early mediation date also is available over the internet at https://www.dccourts.gov/pa/. To facilitate this process, all counsel and *pro se* parties in every medical malpractice case are required to confer, jointly complete and sign an EARLY MEDIATION FORM, which must be filed no later than ten (10) calendar days prior to the ISSC. D.C. Code § 16-2825 Two separate Early Mediation Forms are available. Both forms may be obtained at www.dccourts.gov/medmalmediation. One form is to be used for early mediation with a mediator from the multi-door medical malpractice mediator roster; the second form is to be used for early mediation with a private mediator. Both forms also are available in the Multi-Door Dispute Resolution Office, Suite 2900, 410 E Street, N.W. Plaintiff's counsel is responsible for eFiling the form and is required to e-mail a courtesy copy to earlymedmal@dcsc.gov. *Pro se* Plaintiffs who elect not to eFile may file by hand in the Multi-Door Dispute Resolution Office.

A roster of medical malpractice mediators available through the Court's Multi-Door Dispute Resolution Division, with biographical information about each mediator, can be found at www.dccourts.gov/medmalmediation/mediatorprofiles. All individuals on the roster are judges or lawyers with at least 10 years of significant experience in medical malpractice litigation. D.C. Code § 16-2823(a). If the parties cannot agree on a mediator, the Court will appoint one. D.C. Code § 16-2823(b).

The following persons are required by statute to attend personally the Early Mediation Conference: (1) all parties; (2) for parties that are not individuals, a representative with settlement authority; (3) in cases involving an insurance company, a representative of the company with settlement authority; and (4) attorneys representing each party with primary responsibility for the case. D.C. Code § 16-2824.

No later than ten (10) days after the early mediation session has terminated, Plaintiff must eFile with the Court a report prepared by the mediator, including a private mediator, regarding: (1) attendance; (2) whether a settlement was reached; or, (3) if a settlement was not reached, any agreements to narrow the scope of the dispute, limit discovery, facilitate future settlement, hold another mediation session, or otherwise reduce the cost and time of trial preparation. D.C. Code§ 16-2826. Any Plaintiff who is *pro se* may elect to file the report by hand with the Civil Actions Branch. The forms to be used for early mediation reports are available at www.dccourts.gov/medmalmediation.

Chief   Judge   Robert   E.   Morin

# Superior Court of the District of Columbia

Filed
D.C. Superior Court
12/07/2018 15:03PM
Clerk of the Court

## CIVIL DIVISION- CIVIL ACTIONS BRANCH

### INFORMATION SHEET

KRS Processing Inc (KathyAllen President)

Case Number: 2018 CA 008468 B

vs

Date: _____

ASCAP/Kevin Goldberg Fletcher Heald HildrethPLC

■ One of the defendants is being sued
in their official capacity.

Name: *(Please Print)*
26 55th Street NE Washington, DC  20019-6760
Firm Name: N/A

Relationship to Lawsuit

☐ Attorney for Plaintiff

■ Self (Pro Se)

Telephone No.:          Six digit Unified Bar No.:
(202) 396-1225          000000/NA

☐ Other: _____

TYPE OF CASE: ☐ Non-Jury      ■ 6 Person Jury      ☐ 12 Person Jury
Demand: $ 650,000/$100,000                    Other: _____

PENDING CASE(S) RELATED TO THE ACTION BEING FILED
Case No.:_____  Judge: _____  Calendar #:_____

Case No.:_____  Judge: _____  Calendar#:_____

---

## NATURE OF SUIT:      *(Check One Box Only)*

### A. CONTRACTS

**COLLECTION CASES**

■ 01 Breach of Contract
☐ 02 Breach of Warranty
☐ 06 Negotiable Instrument
☐ 07 Personal Property
☐ 13 Employment Discrimination
☐ 15 Special Education Fees

☐ 14 Under $25,000 Pltf. Grants Consent
☐ 17 OVER $25,000 Pltf. Grants Consent
☐ 27 Insurance/Subrogation
    Over $25,000 Pltf. Grants Consent
☐ 07 Insurance/Subrogation
    Under $25,000 Pltf. Grants Consent
☐ 28 Motion to Confirm Arbitration
    Award (Collection Cases Only)

☐ 16 Under $25,000 Consent Denied
☐ 18 OVER $25,000 Consent Denied
☐ 26 Insurance/Subrogation
    Over $25,000 Consent Denied
☐ 34 Insurance/Subrogation
    Under $25,000 Consent Denied

### B. PROPERTY TORTS

☐ 01 Automobile
☐ 02 Conversion
☐ 07 Shoplifting, D.C. Code § 27-102 (a)

☐ 03 Destruction of Private Property
☐ 04 Property Damage

☐ 05 Trespass

### C. PERSONAL TORTS

☐ 01 Abuse of Process
☐ 02 Alienation of Affection
☐ 03 Assault and Battery
☐ 04 Automobile- Personal Injury
☐ 05 Deceit (Misrepresentation)
☐ 06 False Accusation
☐ 07 False Arrest
☐ 08 Fraud

☐ 10 Invasion of Privacy
☐ 11 Libel and Slander
☐ 12 Malicious Interference
☐ 13 Malicious Prosecution
☐ 14 Malpractice Legal
☐ 15 Malpractice Medical (Including Wrongful Death)
☐ 16 Negligence- (Not Automobile,
    Not Malpractice)

☐ 17 Personal Injury- (Not Automobile,
    Not Malpractice)
☐ 18 Wrongful Death (Not Malpractice)
☐ 19 Wrongful Eviction
☐ 20 Friendly Suit
☐ 21 Asbestos
☐ 22 Toxic/Mass Torts
☐ 23 Tobacco
☐ 24 Lead Paint

SEE REVERSE SIDE AND CHECK HERE          IF USED

# Information Sheet, Continued

**C. OTHERS**

- ☐ 01 Accounting
- ☐ 02 Att. Before Judgment
- ☐ 05 Ejectment
- ☐ 09 Special Writ/Warrants
  (DC Code § 11-941)
- ☐ 10 Traffic Adjudication
- ☐ 11 Writ of Replevin
- ☐ 12 Enforce Mechanics Lien
- ☐ 16 Declaratory Judgment

- ☐ 17 Merit Personnel Act (OEA)
  (D.C. Code Title 1, Chapter 6)
- ☐ 18 Product Liability

- ☐ 24 Application to Confirm, Modify,
  Vacate Arbitration Award (DC Code § 16-4401)
- ☐ 29 Merit Personnel Act (OHR)
- ☐ 31 Housing Code Regulations
- ☐ 32 Qui Tam
- ☐ 33 Whistleblower

**II.**

- ☐ 03 Change of Name
- ☐ 06 Foreign Judgment/Domestic
- ☐ 08 Foreign Judgment/International
- ☐ 13 Correction of Birth Certificate
- ☐ 14 Correction of Marriage
  Certificate
- ☐ 26 Petition for Civil Asset Forfeiture (Vehicle)
- ☐ 27 Petition for Civil Asset Forfeiture (Currency)
- ☐ 28 Petition for Civil Asset Forfeiture (Other)

- ☐ 15 Libel of Information
- ☐ 19 Enter Administrative Order as
  Judgment [ D.C. Code §
  2-1802.03 (h) or 32-151 9 (a)]
- ☐ 20 Master Meter (D.C. Code §
  42-3301, et seq.)

- ☐ 21 Petition for Subpoena
  [Rule 28-I (b)]
- ☐ 22 Release Mechanics Lien
- ☐ 23 Rule 27(a)(1)
  (Perpetuate Testimony)
- ☐ 24 Petition for Structured Settlement
- ☐ 25 Petition for Liquidation

**D. REAL PROPERTY**

- ☐ 09 Real Property-Real Estate
- ☐ 12 Specific Performance
- ☐ 04 Condemnation (Eminent Domain)
- ☐ 10 Mortgage Foreclosure/Judicial Sale
- ☐ 11 Petition for Civil Asset Forfeiture (RP)

- ☐ 08 Quiet Title
- ☐ 25 Liens: Tax / Water Consent Granted
- ☐ 30 Liens: Tax / Water Consent Denied
- ☐ 31 Tax Lien Bid Off Certificate Consent Granted

*Kathy Allen - President*

Attorney's Signature

/s/    Kathy Allen 12/07/2018

Date

# SUPERIOR COURT OF THE DISTRICT OF COLUMBIA
## CIVIL DIVISION

**KRS PROCESSING INC**
Attn: Kathy Allen – {President}
26 55th Street NE
Washington, DC  20019-6760

**INITIAL COMPLAINT**

Civil Action No.  2018 CA 008468 B

**VS.**

*Collectively ("Defendants")*
*DEFENDANT 1:*  American Society of Composers,
Authors and Publishers (ASCAP)
*DEFENDANT 2:* Adam Bauer - in official capacity
*DEFENDANT 3:* Wayne Joel - in official capacity
*DEFENDANT 4*: Matt DeFilippis - in official capacity
*DEFENDANT 5*:  Paul Williams - in official capacity
Lawyer Defendants 1-5:
Richard H. Reimer, Esq.
Sr. Vice President - Legal
ASCAP 1900 Broadway New York, NY 10023 rreimer@ascap.com

*DEFENDANT 6:* Fletcher and Kevin Goldberg (attorney-client relationship with KRS in
official capacity)
1300 17th St North 11th Floor
Arlington VA  22209
Lawyer Defendant 6:
Abby A. Franke, Esq. VSB 87276
ECCLESTON & WOLF
1629 K Street, N.W. Suite 260 Washington, D.C. 20006
T: (202) 857-1696, ext. 1105 E: franke@ewdc.com

## TABLE OF CONTENTS

Cases and Authorities.................................................................................................................3
ACTION INVOLVING CONTRACT OR TORTS ..................................................................5
ACTION INVOLVING CONTRACT OR TORTS ..................................................................5
SUBJECT MATTER, JURISDICTION AND VENUE ............................................................5
PARTIES - PLAINTIFF ...........................................................................................................6
DEFENDANT 1 – ASCAP .......................................................................................................7
DEFENDANT 6 IS KEVIN GOLDBERG  "FLETCHER" ...................................................8
BACKGROUND.........................................................................................................................9
II. Reason for This Lawsuit ......................................................................................................10
III. PRONETLicensing's ASCAP Licensing Request.............................................................12
Standard for Review..................................................................................................................12
V.   Statement of the Facts .......................................................................................................13
2014...........................................................................................................................................15
Request for engagement letter and ASCAP ............................................................................15
2015...........................................................................................................................................15
Communications on ASCAP License Request.........................................................................16
VIII. Communication With and Charges Against 'ASCAP Defendants 1-5' ..........................18
2016...........................................................................................................................................21
IX.     Counts Against ASCAP Defendants ...............................................................................21
49.      COUNT I: BREACHED COVENANT OF GOOD FAITH AND FAIR DEALINGS....21
COUNT II. Lack of Good Faith And Bad –Faith For The Agreement and Its Negotiations.......23
ASCAP in coercion and duress to implement a two-year agreement on the Plt .........................24
ASCAP Required the use and payment when using a PRONETLicensing music player ............25
ASCAP required stations to pay extra for 'yellow page directory' listing .................................27
Jan 2016.....................................................................................................................................27
Settlement Demand Letter For Plt's 2015 Loss........................................................................28
70.     COUNT V. Additional Violations of ASCAP Consent Decree of 2001 .........................29
76.     COUNT VI. Violation of Website Intellectual Property/Sherman Act and Price Fixing31
COUNT VII. ASCAP's Failures Continued Into 2016 - Higher Rates and Per Customer Fee ....32
COUNT VIII. 2016 Failures of ASCAP to Add the Agreement Addendum the Plt Requested...34
2017...........................................................................................................................................35
(The Plt's Existing KRS agreement with ASCAP has problems and also is in disarray and should
have an injunction to resolve sections in that agreement)...........................................................35
89.     COUNT IX. Estoppel and Unjust Enrichment for ASCAP Forcing Small Station Forced
to Pay Them................................................................................................................................35
COUNT II - Unconscionable Terms, Breach of Covenant of Good Faith and Fair Dealings
ASCAP 04-16-2016 E-Mail ......................................................................................................37
ASCAP required and still does the use of PRONETLicensing music player and payment to
ASCAP  when the customer does not play ASCAP songs..........................................................37
Why Charges Against WJ ASCAP's Attorney Def 3................................................................40
Why Charges Against ASCAP Matt Defilippis ("MD", "Def 4")............................................43
Why Charges Against ASCAP Paul Williams  ("PW", "Def 5") ............................................43
Summary of Inclusive Charges Actions Against ASCAP .........................................................43
Additional violations of  the law in the Existing 07-07-2016 agreement .................................44

Jurisdiction of the ASCAP Board of Review for Plt's Agreements ........................................ 44
119.    **Breach of Article 8. Indemnification; Limitation of Liability**. 8.1 ASCAP
Indemnification.  (a) ASCAP agrees to defend and handle at its own cost and expense any
demand, claim or action against Licensee, its officers, directors, employees, representatives, and
agents. 45
122.    **Breach of Article  9.8. Arbitration.** Any dispute arising out of or related to this ........... 46
124.    **Breach of Article  9.10. Independent Legal Advice.** Each of the Parties has received i
47
Additional violations against Fletcher Law firm and ASCAP ............................................. 48
Violations and Claims Against Def 6 Kevin Goldberg and the Fletcher Firm ......................... 53
Remedy against Defendant 6 ........................................................................................ 55
In Summary ............................................................................................................... 55
PRAYER ................................................................................................................... 55
**Total Compensation and  Damages Requested of ASCAP** ............................................. 56
**Total Compensation and  Damages Requested of Fletcher Firm (Kevin Goldberg)
Defendant 6** .............................................................................................................. 57
**TYPE OF TRIAL REQUESTED** .................................................................................. 57

## Cases and Authorities

*BROAD. MUSIC v. TAYLOR* 10 Misc.2d 9 (1945) ..................................................... 39
Dyer v. Bilaal, 983 A.2d 349, 355 (D.C.2009) .......................................................... 13
Georgetown Entm't Corp. v. District of Columbia, 496 A.2d 587, 590 (D.C.1985) ............... 13
Kramer Assocs., Inc. v. Ikam, Ltd., 888 A.2d 247, 252 (D.C.2005) ................................. 13
*UNITED HOUSE OF PRAYER FOR ALL PEOPLE, v. WADDELL, INC* ............................. 13
*UNITED STATES OF AMERICA, et al.  v. BROADCAST MUSIC, INC.*, District Court for the
    Southern District of New York Case No. 1:64-cv-3787 citing "....United States v. Armour &
    Co., 402 U.S. 673, 682 (1971) ...................................................................... 40
*UNITED STATES of America, Plaintiff, v. AMERICAN SOCIETY OF COMPOSERS, AUTHORS
AND PUBLISHERS*, Defendants. In the Matter of the Application of Steve KARMEN,
    Petitioner, For an Order Vacating an Award. No. Civ. 13-95(WCC).  United States District
    Court, S.D. New York. March 30, 1989. 708 F. Supp. 95 (1989) ........................... 40
*United States v. Am. Soc'y of Composers, Authors & Publishers, 2001-2 Trade Cas., (S.D.N.Y.
June 11, 2001)* ...................................................................................................... 5

## Statutes

17 U.S.C. §114, §115 and/or §106(1).... [and] (b) A "New Media Service .......................... 34

## Other Authorities

*See 2001 Decree* : "...(B). ASCAP is also prohibited ... ASCAP from discriminating among
    similarly situated licensees ...ASCAP Decree §§ IV(C) ...................................... 30
*See Consent Decree Section IV.* ................................................................................ 26
*see Consent Decree Section IV.  Prohibited Conduct.* (C) Entering into, recognizing, enforcing or
    claiming any rights under any license for rights of public performance which discriminates in
    license fees or other terms and conditions between licensees similarly situated ............... 36
*United States of America v. American Society of Composers, Authors and Publishers.* decree
    section VI of the consent decree ................................................................ 29
*V. Through-to-the-Audience Licenses* ......................................................................... 29

## ACTION INVOLVING CONTRACT OR TORTS

1. Plaintiff KRS Processing Inc/PRONETLicensing.com ("Plaintiff"/"Plt", "PRONETLicensing", "PRONET", "KRS Inc") brings this complaint for restitution, compensation, and monetary loss against ASCAP ("Defendant 1 – Defendant 5") and Kevin Goldberg ("Defendant 6", "Fletcher") and states the following:

2. Defendant 1 - Defendant 5's conduct was prohibited by law (District of Columbia (D.C. Code and/or New York law (N.Y. Code). Defendant 1 to Defendant 5 violated contract and tort law, and their conduct was prohibited. By **U.S. Federal** ASCAP decree *see United States v. Am. Soc'y of Composers, Authors & Publishers, 2001-2 Trade Cas., (S.D.N.Y. June 11, 2001)*{ TA \l "United States v. Am. Soc'y of Composers, Authors & Publishers, 2001-2 Trade Cas., (S.D.N.Y. June 11, 2001)" \s "United States v. Am. Soc'y of Composers, Authors & Publishers, 2001-2 Trade Cas., (S.D.N.Y. June 11, 2001)" \c 1 }.

3. ASCAP is required by the 2001 decree to provide licensing to anyone requesting it. KRS Processing, Inc. (KRS) a District of Columbia (D.C.) small business was such an entity requesting licensing with ASCAP for PRONETLicensing its small service for Internet Radio stations. The Plt requested licensing to provide service to its existing customer database of and expectations of new Internet radio customers. Defendant 1 to Defendant 5 separately and together for the license to the Plt with ASCAP violated contract and tort law. Among these are they were negligent and breached contract and caused the Plt a loss.

4. Defendant 6 also was among other things negligent and breached his contract with the Plt including the engagement letter for his services to the Plt for the PRONETLicensing service with ASCAP.

## SUBJECT MATTER, JURISDICTION AND VENUE

5.    This Complaint ("Compl") is being filed because the Plt and at least one of the defendants

reside or have offices in different states and the Plt is seeking more than $5,000 from at least one

or all of the Defendants separately or together.


6.    Plaintiff anticipates that Defendant 6 of the Commonwealth of Virginia will probably
propose as a defense that the engagement letter between him and the Plt indicates that the venue
for disputes is to be in the Commonwealth of Virginia of Arlington County, but further review of
that also indicates such would be in violation and such clause should be viewed as contrary to the
normal reasons for determining the venue.  It also seems an improper clause to that of fraud to
cause litigation and themselves recover.  The Plt rejects its validity as against that of good-faith.
in negotiations and contracts—a violation of the law in its own right.  See *infra* Counts against
Defendant 6 among them Code of Virginia.  § 59.1-200 - Prohibited practices.

7.    This complaint remains with this court, because the Plt is filing the complaint, and the Plt's

small virtual business is a District of Columbia business.  This court remains the venue because

the Plt's business continues to reside in D.C.  and the Defendants ("Defs") caused the Plt's loss

while the Plt was in the District of Columbia.

8.    Defendant 6 is in the Commonwealth of Virginia areas of Alexandria and Arlington County

within a few miles of D.C.  Def 6 will probably propose that the engagement letter identified

Virginia as the jurisdiction for any disputes.  Def 1- 5 will probably propose that they are a NY

association or corporation and that their agreements are by arbitration—also *infra Breach of*

*contract.*  But both defenses for jurisdiction could be moved to D.C. court.  Any arbitration

clauses could be unenforceable when ASCAP among other things did so by coercing and in

duress did so for such an agreement.  The Plt respectfully requests that the venue remain with

the D.C. Super. Ct.  In reply to the Plt's recent Oct 2017 settlement demand letter Defendant 6

also sent to the Plt that his attorney to that letter was also a firm in the District of Columbia

## PARTIES - PLAINTIFF
9.    Plaintiff is a small virtual business located in the District of Columbia (D.C.) and whose
president is Kathy R. Allen an Information Technology Specialist by trade who retired in 2007

from Federal government after 27+ years of service. Since 1990 the President maintained the small virtual incorporated District of Columbia business as a part-time entity and continues in it today as president, and provides sole support for its operations. When the president started the business in 1989 she was interested in providing software development and data input (data entry) services to the clientele whom she expected to acquire. At the onset of the Internet and the world wide web (www) after 1990, the small business was afforded more opportunities for work-projects because of the convenience of the Internet, and access to virtual and digital clients, and that continued through 2014-2015, and 2015-2017, and today.

10.     In 2009 KRS Inc. began an Internet radio station of its own requiring licensing for such internet radio and in doing so contacted ASCAP for its own licensing for 'streaming' (the term used for Internet radio) the station on the Internet and for promoter licensing that included among other things licensing to KRS Inc. by ASCAP to play songs at events. Neither KRS's Internet radio station nor promoter license are part of this Complaint. This is because KRS Inc. cancelled the station's license with ASCAP after about 3 or 4 years (after it was not providing much in revenue) to obtain a less costly license with an outside company instead of doing it themselves, and the promoter license they continue to maintain (but is not included in the contract or negotiations of this Complaint).

## DEFENDANT 1 – ASCAP

11.  As the Plt knows it ASCAP ("Def 1") is a performing rights organization (PRO) and

provides music licensing to others to permit them to play the songs of songwriters and

composers ("ASCAP Members") who join them. In so doing ASCAP receives payment of

royalties for the songs of these songwriters and composers played through various media

services including radio, Internet radio and music services to name a few. See an on-line

document of a 2014 hearing with ASCAP President and Chairman of the Board of the American

Society of and discussions on the organization (ASCAP):

http://judiciary.house.gov/_cache/files/5b77d14c-1ea5-491a-a508-5167e5d3d95c/062514-

music-license-pt-2-testimony-ascap.pdf, as an organization for music royalties (payments

others pay to play these ASCAP-member songs).

## DEFENDANT 1 TO DEFENDANT 5 ARE THE "ASCAP DEFENDANTS"

12.  All of these Defendants were responsible or contributed to the Plaintiff's loss. ASCAP is a

performance rights organization (PRO) *based in New York*, and as the Plt came to know it, they

are accountable to their 2001 Consent Decree that provides distribution of music royalties for its

members. *See their website at ASCAP.com* for this and their governing laws. They provide

licensing for songwriters and composers, and by that under *see section VI of the consent decree,* ASCAP must give a license to anyone who requests one.

13.   An entity requesting a license does not have to pay what ASCAP wants in fees if there is a disagreement, they can then go to the "rate court" under section IX of the decree, under which ASCAP has the burden of proof.   Such requests for licensing usually come through entities like KRS and its PRONETLicensing service.   All of these ASCAP Defendants were responsible or contributed to the Plaintiff's loss and by the 3-year statute of limitations the Plt brings this lawsuit, and would be within the statute of limitations.

### DEFENDANT 6 IS KEVIN GOLDBERG "FLETCHER"

14.   Fletcher is a law office located in Alexandria, VA, and Kevin Goldberg is an attorney with them.   They provide attorney services, and Kevin is supposedly knowledgeable in licensing for such services with ASCAP by this private firm attorney, **KEVIN GOLDBERG** ("PFA", "KG") was the Plt's former attorney for ASCAP licensing.   In 2014 when the Plt signed the engagement letter **with PFA** as the attorney for negotiations for the licensing with ASCAP for PRONETLicensing it already had at least *100 Internet radio station customers.*

15.   The Plt anticipated using this attorney but had not expected the negotiation to require more than a few hours of the attorney's legal time to complete or to cost more than the retainer fee the Plt had paid and definitely *not much more than the retainer* amount.   One reason for this is the attorney's rate was extremely high, and as the Plt knew it, he was one who had expertise in such licensing, and also his expertise would account for less time to get the licensing request ("agreement") with ASCAP.   Over a 3-month period from Jan 1 – Mar 2015, PFA periodically communicated with PRONETLicensing by E-mail about the status of the ASCAP agreement, which in Jan 2015 from communication with ASCAP the attorney told the Plt that ASCAP sent him a reply that said: "PRONETLicensing service could be started."   There is at least one E-mail from Def 6 on this.   It was the Plt's understanding that the PRONETLicensing service was indeed to be started ( using the model rate fee of a competitor who is not party to this Compl),

and the rate was to be based on 5% monthly gross revenue received from the service. This competitor already had this as an existing rate with ASCAP in a similar service agreement.

BACKGROUND

16.  In 2008 the Plt (KRS) started two (2) Internet radio station authorized by SoundExchange (SX) under *Sections 112 or 114* of the Copyright Right Board (CRB) and Digital Millennium Copyright Act (DMCA), and paid SX for those for approx 4 years.

17.  In 2014 the Plt was provided with the opportunity to start the PRONETLicensing service with SoundExchange (SX). In doing so the Plt was able to acquire and service at least 100 Internet Radio station affiliates (customers) who together increased revenue each month for the Plt's small business.

18.  **Copyright Board** ("CRB") is the organization that provides by Congress for the fee rates that will be used for playing a song ("performance fee"). It includes member songs played on Internet radio station thus the term performing rights organization (PROs). In 2008 or so the rates for playing songs were established and approved by them for Internet radio stations, but rates in 2016 begin to be on a per song basis, and until 2016 it was usually on monthly gross revenue of a service such as PRONETLicensing. These rates are determined usually for 5 years (or at least were since 2008),. This allows services like KRS to service Internet Radio stations, without each station doing this themselves with the PROs or going to SX (see below).

19.  **SoundExchange** ( "SX") is the organization that services and consumers use to signup their Internet radio and pay the performance rate for the song each time it is played. For KRS this means it would signup its PRONETLicensing service with SX and begin to offer this service to its own customers as a 'one-stop-shop' for the customer stations to pay these performance fees.

20.  The problem with all of the rates imposed by SX is that many services think the SX rates are too high, and there is a large amount of advocacy to bring the rates under control to remain

reasonable fee.  One reason for this is that a service nor a consumer could afford a very high rate, e.g., $.20 each time a song is played, because a station with limited monetary resources would never be able to pay such a rate—thus forcing them to close their station or not to open a station, and is  a detriment to music artists and music as a whole.

21.  The service PRONETLicensing provides expects a bulk or lower rate with the PROs (including ASCAP-Def 1) for song performances—but a fair price also is expected.  When PRONETLicensing does so its customers do not have to themselves worry with paying an astronomical fee or themselves be required to maintain the requirements for it—they just pay monthly to PRONETLicensing (KRS) who handles everything for them.  The service (PRONETLicensing) provides is also for the necessary reporting to ASCAP (Def 1-5) on usage of the songs played for customers' stations, and KRS and the stations expect to pay less and push music and Internet radio forward, and pay in one place.

## II. Reason for This Lawsuit

22.  The Plaintiff really had a loss incurred in 2015 by the actions of ASCAP (Defendant 1 to Defendant 5) in the negotiation or lack thereof for its licensing request, and of those of KRS's attorney Defendant 6 (Fletcher Firm) who abandoned the Plt in its efforts to finalize the ASCAP licensing for PRONETLicensing.  There are at least two identifiable contracts for this lawsuit.  One contract engagement letter agreement signed  2014  between KRS and  Kevin Goldberg and Fletcher Firm, which came about because KRS was to begin by Jan 1, 2015 to provide the service.  The other contract is for ASCAP 2015 negotiations or lack there of, 2016 negotiations, and for 2016 negotiations to a final KRS agreement 07-07-2016, and among them are violations against ASCAP of the decree, negligence, and fraud.

23.  The Plt is filing *PRO SE* and is a virtual small business in D.C. and has included in this Complaint references to E-mails and phone discussions as evidence of KRS's good-faith to negotiating the Plt's request to ASCAP for licensing and to Def 6 (breaching attorney) to make things happen for PRONETLicensing and getting the agreement signed, which Def 6 in lack of good-faith and in bad-faith (pften recognized term for conduct) did not complete for the Plt, as

he had promised in the engagement letter. Each of the *Defendants 1 to 5 and Defendant 6 directly or indirectly contributed to the Plt's loss of customers, her time spent trying to resolve the matter* of the ASCAP license, and in their negligence to the Plt's request for the licensing with ASCAP, and the timeliness to the agreement.

24.   Defendants 1-5 suggested in the Plt's o/a Nov 2017 at least the second settlement demand letter sent to them about her loss with them in providing the Plt with an agreement is that the Plt should not bring her case to a court of law, such as D.C. Super. Ct., but by arbitration, but that should not serve to be the venue to resolve this when the Plt repeatedly informed Defendants 1-5 of the improprieties in their agreement and its sections as it applied to the true day-to-day operations of the stations. Instead Defendants 1-5 ignored her pleas to them about the Plt's customer needs and how ASCAP was affecting the Plt's monetarily.

25.   When the Plt contacted them as recent as Nov 2017 they proposed that the agreement demanded arbitration—but that is too late considering the Plt's numerous pleas to them about the agreement, and their continuing to stress, harass, and threatening the Plt to the agreement's contents.

## Summary of violations against Defendants

26.   **Violation of D.C. Consumer laws**; UCC - ..."goods" within the meaning of Uniform Commercial Code, Article II. **NY Law and Rules**:   (201 - 218) Limitations Of Time Article 2 - Limitations Of Time; **Virginia Law**. Code of Virginia § 8.01-228 - Limitations of Actions 8.01-228  - 8.01-§ 8.01-246 - Personal actions based on contracts; § 8.1A-103 - Construction of **Uniform Commercial Code** to promote its purposes (a) The Uniform Commercial Code shall be liberally construed and applied topromote its underlying purposes and policies, 2) to permit the continued expansion of commercial practices through custom,usage, and agreement of the parties; and(3) to make uniform the law among the various jurisdictions. (b) Unless displaced [any actions] relative to capacity to contract, principal and agent, estoppel, fraud, misrepresentation, duress, coercion, mistake, bankruptcy, and other validating or invalidating cause supplement its provisions.   Grounds for standard of care 49 U.S.C. § 1421 (1964), seem to us to be relevant and useful evidence on the standard-of-care issue, and we think them admissible under the federal practice." Ibid. at 316 (citations omitted); **D.C. Consumer Protection Procedures Act (CPPA)**; Plaintiffs' reliance on the definition of "merchant" found in § 2-104 of the Uniform Commercial Code; UCC §28:1-103((a-b,d)  **D.C. Code among them § 28–3904.**(a-

b,d–e,f); Unfair and deceptive business practices, Breach of fiduciary duty; Deceit, and unsound business practices; Unfair and deceptive trade practices; Remedy by § 28–3905; Negligence; Breach of the Implied Covenant of Good Faith and Fair Dealing; Breach of Contract; Unfair competition; **Price-fixing** using Plt's existing website prices; Sherman Act; Violation of ASCAP 2001 Decree; Unjust enrichment and estoppel.

### III. PRONETLicensing's ASCAP Licensing Request

27.    In late Nov or Dec  2014 at the referral of another (not party to this Compl), KRS contacted Kevin Goldberg of Fletcher about his services for KRS and a ASCAP new agreement. This is a service that SoundExchange (SX)  (not party to this Compl) provided in 2015, but eventually was to be replaced at the end of Dec 2015 with a new per station yearly rate.  In 2015 KRS provided support for this to Internet Radio stations as a 'one-stop shop 'for music royalty payments for songs played on their stations.  This support included invoicing customers, and acquiring new and potential customers for its service and doing so by decree to play ASCAP (Def 1) songs.  The Plt contacted Def 6 for legal advice and service on the necessary agreements for ASCAP, SoundExchange and two other PROs (but just ASCAP is included in this Compl), and was provided the following information by E-mail: "merely signup for the service [SX], submit the form for the service and pay the minimum fee, and that he (Def 6) had contacted ASCAP and was told KRS could start the service in Jan 2015 *see E-mail or Exhibit 1*, which the Plt did, and was to be based on the 5% of monthly gross revenue model in the letter to ASCAP. **KEVIN GOLDBERG (Def 6)** Kevin accepted  the  Plt's  engagement  letter  on  <u>11-24-2014:1239pm</u> saying: "…So, I'm happy to finalize everything, consider it an attorney-client relationship and start making calls to ASCAP…."

28.     The model (*competitor's see below RC1 redacted*) service already had such a service, and the Plt was to start its own new service with ASCAP and SX modeled 100% on it. This client-attorney engagement signed, and was from *Nov 2014 to approx Apr 2015* as below.  Then for some reason *on or about (o/a) Apr 2015* Def 6 begin to inquire to the Plt about and request that the Plt would need more on the attorney retainer.  This began the differences KRS and Def 6 on what the Plt sees as breach of the client-attorney engagement, and also began requiring the Plt's one-on-one negotiations with ASCAP for the completion of its 2015 licensing request.

### Standard for Review

29.   This case is premised on the fact that contracts should be negotiated in good faith. *See {*
TA \l *"UNITED HOUSE OF PRAYER FOR ALL PEOPLE, v. WADDELL, INC"* \s "UNITED
HOUSE OF PRAYER FOR ALL PEOPLE, v. WADDELL, INC" \c 1 }.  "....While agreement
as to material terms "is most clearly evidenced by the terms of a signed written agreement ...
such a signed writing is not essential to the formation of a contract." Kramer Assocs., Inc.  v.
Ikam, Ltd., 888 A.2d 247, 252 (D.C.2005){ TA \l "Kramer Assocs., Inc. v. Ikam, Ltd., 888 A.2d
247, 252 (D.C.2005)" \s "Kramer Assocs., Inc. v. Ikam, Ltd., 888 A.2d 247, 252 (D.C.2005)" \c
1 } (internal quotation marks omitted). Rather, "[t]he parties' acts at the time of the making of the
contract are also indicative of a meeting of the minds."  ){ TA \l "Dyer v. Bilaal, 983 A.2d 349,
355 (D.C.2009)" \s "Dyer v. Bilaal, 983 A.2d 349, 355 (D.C.2009)" \c 1 }.  *Compare: New York
and VA law for breach of contract and negotiations of them.*

30.    See Wendell:  "For an enforceable contract to exist, there must be both (1) agreement as to
all material terms; and (2) intention of the parties to be bound." Georgetown Entm't Corp.  v.
District of Columbia, 496 A.2d 587, 590 (D.C.1985){ TA \l "Georgetown Entm't Corp.  v.
District of Columbia, 496 A.2d 587, 590 (D.C.1985)" \s "Georgetown Entm't Corp. v. District of
Columbia, 496 A.2d 587, 590 (D.C.1985)" \c 1 }.  "[T]he determination of what the parties
consider to be the material terms of their agreement is a question of fact." Strauss v. NewMarket
Global Consulting Grp., LLC, 5 A.3d 1027, 1033 (D.C.2010). We may reject that determination
and any of the trial court's other findings of fact only if they are "clearly and manifestly wrong"
or "without evidence to support them." Id. By contrast, "[t]he determination whether an
enforceable contract exists   is a question of law[,]" Rosenthal v. National Produce Co., Inc., 573
A.2d 365, 369 n. 9 (D.C.1990), which this court reviews de novo. Dyer v. Bilaal, 983 A.2d 349,
355 (D.C.2009){ TA \l "Dyer v. Bilaal, 983 A.2d 349, 355 (D.C.2009)" \s "Dyer v. Bilaal, 983
A.2d 349, 355 (D.C.2009)" \c 1 }.  *Compare: New York and VA law for breach of contract and
negotiations of them.*  See 1.12.9 New Media Transmission Definitions.(a) A "New Media
Transmission" shall mean:(i) a digital audio transmission that, in addition to requiring a public
performance license, also requires the Music User to comply with the license requirements of 17
U.S.C. §114, §115 and/or §106(1);....p. 14....made in accordance with the Articles of
Association or a claim arising under the Second Amended Final Judgment in United States v.
ASCAP, Civ. Action No. 41-1395 (S.D.N.Y. June 11, 2001), and whether accrued before or after
the adoption of this regulation, shall be construed and interpreted under the laws of the State of
31.    New York, and shall be subject to the exclusive jurisdiction of the courts of the State of

New York located in the County of New York (including the Federal courts so located, should

Federal jurisdictional requirements exist).

## V.      Statement of the Facts
### About Internet radio music royalties and KRS customers

32. In 2013 KRS acquired a project to work with *Redacted Company 1* ("Redacted Company 1",
"RC1") to provide customer representative phone support to RC1. RC1  (who is not party to this
Compl, but is the model-competitor service KRS followed for its licensing with SX and ASCAP)
provided Internet radio streaming service for music royalty payments that included ASCAP.  At
that time the SX rate for a song performances for this was extremely reasonable, but in 2015

things changed in this cost, because SoundExchange who maintains music royalty distribution of payments for its own members (as provided by Congress and U.S. Code Section 112 and 114) were going to allow services such as RC1 considerably less on a monthly basis, thus more in costs to RC1.

33. Because of the rates proposed for 2015, to lower its cost (and to not leave its customer without a service), to meet the new requirement RC1 decided it needed to decrease its customers in 2015 and in doing so discussed the possibility of KRS acquiring and servicing some of them, thus lowering it to within the new SoundExchange limits. In negotiating with RC1 KRS thought this was a good opportunity. So RC1 and KRS entered into an agreement for RC1's customer base to be transferred to KRS, who would service them instead of RC1. This was one problem in 2014 for Internet Radio stations. The other is as below that happened for 2015.

34. The agreement for this transfer of customers from RC1 to KRS was provided by Kevin Goldberg ("PFA") of **Fletcher who was also** RC1's attorney at the time. KRS signed a noncompete with PFA for both RC1 and KRS to be represented by him for this transfer. This transfer of customers also required a second agreement for KRS to use the RC1 software that monthly calculates customer stats for songs played, and for reporting of these stats to ASCAP and the other PROs. These reports are one of two primary functions used for music royalty payments. The other function is a music player that allows customers to add the music player to their website, so a customer's listener can click and actually hear the station and song playing.

35. In a separate agreement engagement agreement PFA was to represent KRS in acquiring their license for this service and provide it to its customers, and this included requesting it of ASCAP. PFA began to do this for KRS on or **about Jan 2015** by sending a letter to ASCAP requesting the license (the 2001 ASCAP *see decree* requires that licensing be by written request). The written request included that KRS would be 'modelling' its PRONETLicensing service identical to that of RC1, and KRS requested the same license and terms as the model, based on 5% of monthly revenue. So KRS based on PFA's E-mail began the service and servicing customers, and to acquiring new customers based on Def 6's notification and advice, and the 'go ahead' from ASCAP. This Compl is for the **timeframe of  Jan 1, 2015 through June 30, 2016,** and as of this Compl filing as the Plt sees it the named Defendants were tortuous, negligent and

breached their contract (written and verbal) agreement, and acted with lack of good-faith and in

its negotiations with KRS.  Among other things below are the Defendants' failures:

## 2014
### Request for engagement letter and ASCAP

36.   **Defs 1-5 continued** negotiating the agreement with the Plt's attorney (PFA)  beginning
and sending these in Dec 2014. These were E-mails he sent the Plt:  "PFA's **E-mail 12-08-
2014:253pm** saying: "…I'll be calling both ASCAP and … today to get this started…AND **E-
mail 12-11-2014:422pm**  saying: "…I've now spoken with representatives of all three
Performance Rights Organizations you'll need a license from on the musical works side
(SoundExchange, of course, is the entity that licenses performance of sound recordings).
Actually, *I heard back from all three yesterday, though I had a pre-scheduled call with…. The
good news is that we're moving forward with each and I'm pretty certain we'll eventually get a
fair deal from each of them.*  The bad news is that I don't think any of those deals will be reached
before January 1. *However, that doesn't prevent you from actually starting your service on
January 1.* I'm not sure we had everything locked down when **[RC1 - redacted]** started either.  I
KNOW that we had one situation where we eventually reached a deal with ASCAP that applied
retroactively to January 1 even though he was operating under a different deal with them at the
time. … "  Another E-mail PFA sent 12/15/2014 105pm saying: "…I reached out to both of their
attorneys again earlier this week. ASCAP's attorney says she can't even start on this until the
week of January 5.But neither requires anything more from you prior to commencing
operations…."  This was approving the Plt to begin the service and no indication of being
unreasonable or unconscionable or that the Plt should expect it to be unaffordable for KRS or its
customers—often indicating in them that unlike a rate by Congress as with SoundExchange
ASCAP really could provide a reasonable rate to the Plt.

37.   The Plt has several E-mails on this including that PFA was to go to a broadcasters' and

PRO conference early in quarter 1  ("Q1") of 2015 about SoundExchange's rates for 2015.  Both

he and ASCAP continued to allow KRS to service customers without any update on the license,

and PFA indicated he hoped to have more on the agreement after that conference—but also

indicating that both he and ASCAP were delaying and it is evident one or both of them were in

fact 'dragging their feet'.  As best KRS can tell and for the first three months of 2015 KRS

asked of him repeatedly about the ASCAP license but was told to wait and Def 1-5 and Def 6

provided none—all to the constant inquiry by the Plt to update her on its progress. So both he

and Def 1 –Def 5 were dragging their feet.

## 2015

**Communications on ASCAP License Request**

38.  **02-17-2015** 104pm Def 6 sent an E-mail saying: "….I plainly don't understand why they aren't moving this along and hopefully can get an answer on that. There would seem to be no reason – especially on ASCAP's side – for the delay…." **03-06-2015** Def 6 (PFA) sent KRS what he called the 'red-line' draft of an ASCAP agreement. **03-10-2015** Def 6 began asking for more on the retainer saying: "….Consistent with what I told you at the beginning of the representation, though, I've really tried to be judicious about billing in several different ways….You're at a point know where you can "pay as you go", i.e. pay when billed…." **03-19-2015 and 3-20- 2015** 405pm Plt sent E-mail to Def 6: "….Per …E-mail 3/18/2015, yesterday, we are both waiting for ASCAP to respond…to give us their proposal in writing to you…. I introduce myself to ASCAP and probably Adam, since he was the one who sent the last E-mail to you, I will have some ideas about this and anything that might affect PRONETLicensing to discuss with him…for now I think the best thing to do is for me to communicate with ASCAP using the contact in the last E-mail and do just that of introducing myself. … I don't want to say to reschedule the conference call if I do not get a reply or get to speak with ASCAP by that time, because again it is my $$$$ for your fees to do that. But I think if I speak with them it would be a good thing to do.I hope they will provide me some feedback on what we say when we speak for us to get a more reasonable agreements. Then get you in on it again after doing that…."

39.  On **04-01-2015**. The Plt asked him again about the agreement. **03-10-2015** At this time Def 6 also began requesting additional $400/hr fees of KRS to continue negotiations with ASCAP, but yet to provide the completed agreement or license for the PRONETLicensing service. Because the Plt's was limited on funds for paying Def 6 any more than was already on retainer, and they were a small business, the Plt asked Def 6 if she could contact ASCAP directly to further negotiate the agreement for an acceptable rate, and since any more time by Def 6 would require more than a few hours this would allow her to not spend so much on attorney fees for the rate for the license. **PFA sent a reply E-mail** that the Plt could do so. This was because Def 6 was requiring and requesting more on the retainer, and because ASCAP was o/a **03-2015** proposing the KRS license would not be on gross revenue of 5%. It would be less costly if KRS contacted ASCAP directly and discussed the agreement rate and come to some terms with ASCAP then have PFA (Kevin Goldberg) view it when they had an agreeable rate.

40.  In so doing it was PFA and KRS's agreement by this E-mail that KRS and ASCAP were to

discuss the license among themselves, and when there was something more definite or agreeable

(on the rate fee ASCAP proposed) that the Plt felt was doable for the licensing, including the rate

structure, that they could agree to, the Plt was to let Def 6 (PFA) know so he could review what

that ultimately was, provide any comments on the agreement (contract), so the Plt could finish

the agreement for the licensing and sign it. The Plt began her contacts with ASCAP for the

license by E-mail and a couple of phone call, but at least 5 or 6 more calls the Plt made to

Adam Bauer (Def 1) who was ASCAP's representative for digital licensing agreements (and who

Def 6 had sent to the Plt by E-mail as who to contact for the licensing along with Wayne Josel

("WJ", "Def 3", the ASCAP attorney) as those who would be available to the Plt for discussing

the ASCAP license and rate and getting the agreement finished.

41.   This is how the Plt learned of whom to contact for the ASCAP licensing—and she was to

do so until there was a more agreeable rate. But Def 6 (PFA was not being terminated by KRS

and he was expected to be contacted. Nor had the Plt terminated the client-attorney

relationship), but KRS was just suppose to discuss rates and ideas about the rate—to get a better

rate with ASCAP). *First*, the problem about the agreement was that the Plt had to invoice

existing customers based on the ASCAP rate and try to continue to acquire new customers using

the ASCAP rate—so it was not to be an indefinite timeframe that KRS had available, and both

Def 1-5 and Def 6 knew or should have known this. *Second*, this agreement and discussions

with ASCAP were to be as expeditious as possible, because the Plt had to know what to have

new customers pay and now she also was being forced to not allow new customers to signup for

the service (loss of revenue), and ASCAP was suggesting in Apr 2015 a non-gross revenue

license rate. Also the *2001 ASCAP decree* provides for licensing within 60 days—which

ASCAP also had now failed to do.

42.   Any ASCAP license would be provided to KRS for its affiliates [customers] in accordance
with and as  defined in the *see ASCAP 2001 Consent Decree Section II. (F-H)* Definitions  and as
"On-line music user" means a person that publicly performs works in the ASCAP repertory via the
Internet or similar transmission facility…[and] (P) "Representative music user" means a music user
whose frequency, intensity and type of music usage is typical of a group of similarly situated
music users…." But as below (*see RC 1*) was suggested as a similarly situated music user, but
ASCAP did not provide KRS with who they considered to be a similarly situated [service, [and RC1
their model service also was facing the same problem] for a rate fee and what it would be based on—
actually destroying the existing RC1 client base and not providing who they were using as a typical
similarly situated group for a new rate—but at the same time suggesting that  it was the RC1
competitor—and any rate would not be on monthly 5% of revenue, but by a monthly per customer
rate.  Essentially they also had destroyed RC1's clientele based on the rates they were now planning
to force both RC1 and KRS customers to pay monthly instead of on gross revenue—but that too was
not in place by the allowed time for it in the ASCAP decree of 60 days—thus one of their failures.

## VIII. Communication With and Charges Against 'ASCAP Defendants 1-5'

43.   Defs 1 to 2 (ASCAP) were: (1) slow in replying or did not reply to the Plt's E-mails, and

this was after Def 6 told him and Def 4 to work with the Plt directly on the license, and (2) there

are several actions against ASCAP for their failures to the license, because of it, and among them

are: (1) Tort laws, (2) negligence, (3) unfair dealings, (4) price-fixing, (5) unfair and deceptive

business practices and false and misleading and misrepresentation statements, (6) breach of

contract, and (7) fiduciary duties.


44.   KRS was to let Def 6 know on the final ASCAP discussions and negotiations and ultimate

rate for the PRONETLicensing agreement.  Plt time spent several hundred hours and several E-

mails with negotiations with ASCAP, they ASCAP was outright refusing to complete the

agreement timely.  Def 2 inappropriately used the prices on PRONETLicensing's existing

website to provide rates (violation of Intellectual property and Sherman law), and in doing such

an agreement  (would and did) required the Pltto completely restructure its own pricing for its

customers —that would eventually cause loss of customers and required the Plt to increase its

monthly fees to accommodate what ought to have been merely a reasonable fee provided to them

but not one based on the Plt's existing website prices—more breach of the covenant of good-

faith and fair dealings—also inappropriately requiring the Plt to send them their number of

customers and what each existing customer paid them monthly.  That alone is enough for breach

of covenant of good-faith of any jurisdiction—because they should just say: OK our fee will be

$20.00/month, etc..  But ASCAP should not try to see how many customers the Plt had then

provide a price to benefit themselves.  Although the Plt had  more than a couple of customers—

which it wanted to maintain and acquire more, what if they had one or two customers instead—

would ASCAP have provided a lower fee or priced it higher—thinking they would get more or

less in payments.  It does not warrant their price-fixing and to that of intellectual property of

using the website.  That too would be in violation of the ASCAP decree to 'picking and

choosing' who to license to and the cost—though any price should be reasonable based on some

factor—but not that factor of the Plt's existing prices.

### No licensing agreement at the End of 2015

45. Because of ASCAP's through Def 2's 'dragging their feet', outright refusal to meet the Plt in

any way or not at all in lowering the now 'long-awaited ' 2015 license and Plt's reply to ASCAP

on the high monthly broadcaster fee they proposed, and in the negotiations of it, on **Dec 10, 2015**

the 'Plt ended up having to send customers a requirement to no longer play ASCAP songs '

because of this impasse they called in negotiations now going on for almost a year since Jan

2015—failures to at least the *2001 Decree of 60 days*.  This was because of the adamancy of Def

1 (Def 2) as digital representative for licensing to resolve the agreement or refusal to pay for

music royalties for its customers based on what was to be 5% of gross revenue, when the Plt

began the service in Jan 2015—but instead ASCAP was trying to implement a per broadcaster

fee measurement of $15-20 per customer and an additional ATH payment when over a certain

amount.  This too is unconscionable to negotiation of the agreement (contract), because what

ASCAP proposed did not include what a customer could get on their own going directly to them

instead of the Plt's service for it, and definitely this rate was not the regular 'blanket' licensing—

all to their failures and violation of the 2001 ASCAP decree.

46. O/a 12-10-2015 Def 1 told the Plt that was what the agreement *'would be '* and the Plt *'would
have to pay it for* usage [retroactive] since Jan 2015' to-date (an astronomical amount for
PRONETLicensing (PROnet) and its customers) if it were not based on 5% of gross revenue.
Def 1 also outright refused to change this and told the Plt that she would be required to pay based
not on 5% of gross revenue but on a per customer rate they proposed.  On 9/28/2015 KRS wrote
to ASCAP: "….We are awaiting your reply to the E-mail sent below.  We have to get this
completed and prepare for 2016…. **" On 10/1/2015 ASCAP replied: "….**Needless to say, we
do not agree with many of your assertions.  In the interest of furthering our efforts toward
coming to a final agreement, I will not respond to your email point-by-point with one exception:

In your narrative you acknowledge providing comments on ASCAP's "proposed agreement" on March 25. Therefore you cannot now claim that PROnet "was approved to begin [its] service in Jan 2015 using the same payment structure that [Redacted company – RC1] used." As should be clear from the continued exchanges, we've not reached agreement on the economic terms of an agreement and ASCAP has not issued any sort of approval to PROnet." **See E-mails 10/30/20 10:55am saying: "....**Accordingly, our proposal of 10/28/15 stands. If it is unacceptable to you, PNL shall remain an ASCAP license applicant pursuant to the terms of the ASCAP Consent Decree solely for purposes of the public performance of works in the ASCAP repertory made by PNL (i.e., transmissions made by or on behalf of PNL). Any and all other public performances of ASCAP music (i.e., those transmitted by PNL "affiliates") are outside the scope of PNL's pending license application and, in the absence of separate licensing, unauthorized. **....**"; **on 12-3-2015 12:15pm ASCAP saying: "...**Our proposal of 10/28/15 stands. If it is unacceptable to you, PNL shall remain an ASCAP license applicant pursuant to the terms of the ASCAP Consent Decree solely for purposes of the public performance of works in the ASCAP repertory made by PNL (i.e., transmissions made by PNL). Any and all other public performances of ASCAP music (i.e., those transmitted by PNL "affiliates") are outside the scope of PNL's pending license application and, in the absence of separate licensing, unauthorized....**12-9-2015 also saying: "...."** Essentially this was saying the customers were not covered, and the Plt was to pay extra.

47. So, on **Dec 10, 2015** KRS 'had to notify all of the stations to immediately cease playing ASCAP songs'. This meant PRONETLicensing and its stations by ASCAP's E-mail were not authorized to play the songs since Jan 2015 without paying the new broadcaster rate fee, and KRS loss the revenue for these stations to the end of the month of Dec 2015, and no agreement had been reached either—leaving the Plt without licensing, and now ASCAP was adding a requirement of broadcaster fee per affiliate—which also continued to be priced based on PRONETLicensing website's and would be intellectual property of pricing. In doing so ASCAP demanded PRONETLicensing customers were not approved to play ASCAP songs for all of Jan 1 – Dec 2015 (year). *See Consent Decree Section IX. Determination of Reasonable Fees.* "...In the event ASCAP requires such additional information, it shall so advise the music user in writing, and shall advise the music user in writing of the fee that it deems reasonable within sixty (60) days of receiving such information... or within sixty (60) days of ASCAP's request for information, whichever is later, the music user may apply to the Court for a determination of a reasonable fee retroactive to the date of the written request for a license, and ASCAP shall, upon

receipt of notice of the filing of such request, promptly give notice of the filing to the Assistant

Attorney General in charge of the Antitrust Division. If the parties are unable to agree upon a

reasonable fee within ninety (90) days from the date when ASCAP advises the music user of the

fee that it deems reasonable or requests additional information from the music user, and if the

music user has not applied to the Court for a determination of a reasonable fee, ASCAP may

apply to the Court for the determination of a reasonable fee retroactive to the date of a written

request for a license and ASCAP shall upon filing such application promptly give notice of the

filing to the Assistant Attorney General in charge of the Antitrust Division...."

48. ASCAP *failed to provide the license within 60 or 90 days and for over a year*—to their
negligence and breach of the covenant of good-faith and fair dealings to such an agreement
(contract)—causing the Plt's loss of revenue and customers, and stations she had serviced—
at least 100 of them. *ASCAP delayed and continued to do so for the license now for almost* a
year in their perplexed and unreasonable negotiations, and Plt also had spent many hours
directly on discussions for negotiating the licensing with ASCAP at least since Apr 2015 by E-
mail and phone calls—several unanswered, and now also would be violation of the ASCAP
consent *decree of 60* days for providing licensing to any one who requested it—which KRS had
at least now six months ago.  The Plt in good-faith when ASCAP (and Def 2) continued to reply
by E-mail that the 5% revenue fee *was and would not be available* to the Plt, who had provided
alternatives to Def 2 asking for options that would be lower or on the gross revenue, but Def 2
continued with the same conduct and refused, and continued telling the Plt that she had no
license **agreement for 2015**, and said that the Plt was and would be in breach for the payments
and demanded the Plt sign their proposed 2015 licensing agreement for the $15-18 per
broadcaster monthly fee. But this rate was to be out of the Plt's existing $23.50 rate—essentialy
leaving the Plt not enough to pay their monthly expenses. Because of this conduct on Dec 10,
2015 the Plt told its customers to stop playing ASCAP songs—ASCAP's conduct is directly the
cause for the Plt's and its customer stations loss to that of closing their stations, and ASCAP in
so doing  was a *breach of contract, delay to negotiations, bad-faith, lack of good-faith,
unconscionable dealings, and violation of ASCAP decree* for their requested 2015 licensing.

2016
### IX.      Counts Against ASCAP Defendants
49.    <u>COUNT I: BREACHED COVENANT OF GOOD FAITH AND FAIR DEALINGS</u>

50.  **04-02-2016** As above Def 2 at some time had viewed the Plt's website for its 2014 customer
prices—inappropriately viewing it for its own purposes—violation in itself of price fixing and
misuse of intellectual **property to that of** *unfair and deceptive trade practices by D.C. and NY
code for trade and business practices.*  Then ASCAP sent the Plt an E-mail requesting a list of
their existing Internet radio customers including among other things their name, address, and E-
mail.  ASCAP then used this list, the website, and the Plt's list of station directory to provide a

price to the Plt for the license—**Violation is price fixing by and providing a price after using Intellectual property** and **unfair and deceptive trade practices by D.C. and NY Code.** The proposed license Def 1 sent also proposed a per broadcaster fee instead of the gross revenue of 5%. This is one reason why it is price fixing and a violation of **unfair and deceptive trade practices by D.C. and NY Code,** because it should not matter how many customers the Plt had or the price KRS had on their website.  If ASCAP was licensing in good-faith and to that of good-faith and not in bad-faith they would have provided the Plt with the rate, or maintained the 5% of gross revenue instead of asking what KRS had for existing prices or in its number of customers.  This now was also more than 60 days since KRA's attorney (PFA) license, and the ASCAP decree provides for licensing within 60 days.

51.   What if the Plt had maybe ten (10) customers at that time—What would they have

proposed?  Would they have refused the Plt's licensing?—Allowing for the Plt to file against

them in the 'rate court' by the ASCAP decree the Plt could do so. Why didn't ASCAP just

provide a fee maybe $50.00 per station. per month (although that would be high, but at least

some fee that was not compared to the Plt's existing website price).  If they had done this

ASCAP could negotiate with the Plt to discussions on why that rate would be too high or less

affordable.  It is evident that the reason for this was ASCAP was interested in more money—

maybe Def 2 (Adam Bauer—who directly refused the Plt's in good-faith requests of him)  is on

an options plan with ASCAP, and maybe he gets additional bonuses if a service such as

PRONETLicensing pays more—for example maybe Def 2 gets 'a cut' of any monthly rates or a

year-end bonus or one based on it.  These would be considered valid reasons for the rate he

proposed to KRS, but whatever his reasons for the fee these are violations of the law and are

nonetheless cause for actions to *unfair and deceptive trade practices by D.C. and NY Code.*

*Causes of actions and violations: Breached covenant of good faith and fair dealings.* In so doing

Def -5 by Def 2's action were harassing, stressing, threatening the Plt with termination, and also

were *unconscionable negotiations, breach of contract (verbal and written agreement),*

*negotiations in, bad-faith, unfair competition* and use of privileged and intellectual property,

rate/price fixing.

52.  It is evident ASCAP viewed the Plt's website and pricing to see how much they were and so ASCAP could get more and then priced the rate they sent to the Plt for the licensing using it. In so doing even proposing the exact amount to the Plt that was no more than $4 or $5 less than the Plt's existing website pricing—leaving the Plt with no way to recoup their loss. Plt sent Def 2 an E-mail **08/19/2015** that included another **08/31/2015** E-mail "….in Jan 2015 have the PRONETLicensing service, requested the licensing agreement and rate that [RC1] with you…I have not heard from you on the licensing, and would like to pay and submit the royalty payments and reports required…"

53.  Now this E-mail would be more than 60 days since Apr 2016 and the Jan 2016 request for

the license by KRS attorney—alone that is violation of the 2001 ASCAP Decree for 60 days to

requests for licensing.  Def 2 finally sent a reply: **09/22/2015**-111pm saying he wanted to speak

with Def 6 (KRS attorney)….[Def 2] saying "a final agreement, I will not respond to your email

point-by-point with one exception: In your narrative you acknowledge providing comments on

ASCAP's "proposed agreement" on **March 25**.  Therefore you cannot now claim that PROnet

"was approved to begin [its] service in Jan 2015 using the same payment structure that Marvin at

StreamLicensing.com used."  As should be clear from the continued exchanges, we've not

reached agreement on the economic terms of an agreement and ASCAP has not issued any sort

of approval to PROnet.and we've not reached agreement on the economic terms of an agreement

and ASCAP has not issued any sort of approval to PROnet…."  But ASCAP by saying this is no

more than conceding that the Plt provided to ASCAP a discussion on the unconscionable

negotiations they were offering the Plt.  They also are conceding that they had not provided this

since at least March 2015.  Causes of actions: *Harassing, stressing, humiliating unconscionable*

*negotiations, breach of contract (verbal and written agreement), breach of contract to good-faith*

*and fair dealings, bad-faith, fraud, fraudulent conduct to contracts, and failures by ASCAP*

*decree.*

**COUNT II.  Lack of Good Faith And Bad –Faith For The Agreement and Its Negotiations**
     ASCAP requiring a per broadcaster monthly fee refusing to meet the Plt reasonably to it

54.   October 2015 to Dec 2015.   By late 2015 between Oct and Dec Def 1 (through Def 2) began

refusing anything the Plt asked of him on the license negotiations including that he wanted to

retroactive a monthly per broadcaster fee of $15-$18 to the license and add a .005 per ATH

(usage measurement for station's listening hours) fee to the license for the Plt's customers to pay.

Def 2 also in his capacity as digital representative for licensing told the Plt, KRS actually was not

and *would not be covered and none of the PRONETLicensing stations* unless the Plt signed his

recent proposed agreement that included the monthly $15-$18 per broadcaster fee plus additional

ATH fee (as above) retroactive to Jan 2015—and said that PRONETLicensing requiring that

KRS pay it for its customers or that KRS was now in default—and doing so although KRS had

not invoiced the customers for such a fee since Jan 2015—based on the 5% of gross revenue rate.

55.   If ASCAP had been more timely or reasonable in completing the agreement KRS might

have had time to invoice each station—but that too would require payments of the station.

### ASCAP in coercion and duress to implement a two-year agreement on the Plt

56.   Essentially it seems Def 2 was trying to implement a two-year ASCAP agreement with
KRS for its stations and also at the same time refusing to 'change his mind' or to what was
equitable or nondiscriminatory to the stations and KRS to the stations and especially so since the
yer was almost up and the license was not completed—Another *violation of the 60 days for it by
the ASCAP 2001 decree*.   **On 10/1/2015 ASCAP replied by E-mail saying: "….**Needless to
say, we do not agree with many of your assertions.   In the interest of furthering our efforts
toward coming to a final agreement, I will not respond to your email point-by-point with one
exception: In your narrative you acknowledge providing comments on ASCAP's "proposed
agreement" on March 25.   Therefore you cannot now claim that PRONet "was approved to begin
[its] service in Jan 2015 using the same payment structure that they [model RC1-redacted
company] used."   As should be clear from the continued exchanges, we've not reached
agreement on the economic terms of an agreement and ASCAP has not issued any sort of
approval to PROnet."   So this again is their vehemently refusing to the agreement, saying they
had not approved one, that KRS was in default—and payment was expected—*all to lack of
good-faith and to fair dealings*.

57.     So the Plt sent an E-mail to Def 2 on **10/22/2015** 207pm saying "…. "….-*We are waiting to hear from you* (ASCAP) on this since two weeks ago, can you reply today or ASAP. We do want to get things 'wrapped up for 2015' and ready for our 2016 agreement…PRONETLicensing service and our affiliates (customers)…." **Def 2 replied 10/28/2015 3:13pm saying "…. 1)** For the period starting with the launch of PNL through and including 12/31/15, as a full and final settlement of license fees owed to ASCAP by PNL, an amount equal to 5% of gross revenues generated by PNL for operation of the licensed service; and 2) For the period 1/1/16--12/31/16, license fees derived pursuant to the fee structure and other terms and conditions outlined in my email to you dated 10/23/15…". But this was essentially ASCAP's *coercion and in duress forcing* the Plt to agree to the 2016 for the next year along with one for 2015, when in the ASCAP E-mail to launch the service—Def 6 indicated that ASCAP said KRS could be for a one-year contract. This rate for 2015 on 5% of gross revenue might have been agreeable except Def 2 was including in the requirement that the 2016 agreement would be on a higher per customer monthly rate of $15-18 plus additionally for ATH usage—forcing the Plt to duress and coercion to sign it. **Causes of actions**: *Harassing, stressing, threatening, unconscionable negotiations, breach of contract (verbal agreement), breach of contract to good-faith and fair dealings, bad-faith, fraud, fraudulent conduct to contracts, and estoppel to additional payments for a listing with a 'sort-of yellow page music directory' (their agreement would require this)*

58.     COUNT III. Breach of Contract, Delay, Bad-Faith, Lack Of Good-Faith,

Unconscionable Dealings, Violation of ASCAP Decree Sections

59.     COUNT IV - Unconscionable Terms, Breach Of Covenant Of Good Faith and Fair

Dealings ASCAP 04-16-2016 E-Mail

### ASCAP Required the use and payment when using a PRONETLicensing music player

60.  The license agreement ASCAP proposed required the Plt's customers to pay a monthly fee to ASCAP just because they used the music player (which with PRONETLicensing service is and can be a separate add-on—therefore a customer is not required to always use the PRONETLicensing music player). To do this the station merely indicates it is or will not be playing ASCAP songs, essentially excluding ASCAP songs when the station broadcasts. **Causes of action:** *Unjust enrichment and estoppel.*

61.  When the Plt informed ASCAP that what they proposed was a customer add-on not a

requirement Def 2 outright refused to allow the Plt's addendum to the final **July 2016** agreement

that provided for how the music players to customers should be licensed when they requested not

to add this for their station. **Causes of action:** *Unconscionable terms, breach of covenant of*

*good faith and fair dealings.*

**ASCAP required the use and payment of the PRONETLicensing music player when the customer does not play ASCAP songs (Plt's 2016 loss and Agreement dtd 7-7-2016)**

62. ASCAP also required one of the Plt's small station to pay to them approx $2,000 (at least 10 times more than the normal rate for its usage between Jul-Dec 2016). The station had signed up with PRONETLicensing as a station that did not and would not play ASCAP songs. ASCAP (Def 2) when the Plt notified it of the station's status ASCAP could have allowed this small station to get a GoDirect license with ASCAP, but Def 2 refused. *See Consent Decree Section IV{TA \l "See Consent Decree Section IV" \s "See Consent Decree Section IV" \c 3 }. Prohibited Conduct.* Entering into, recognizing, enforcing or claiming any rights under any license for rights of public performance which discriminates in license fees or other terms and conditions between licensees similarly situated..."—Their requirement for customers to pay monthly broadcaster fees when no ASCAP songs were played would be *discriminatory and unjust enrichment, and should be estoppeledl*. This payment that Def 2 required also was discriminatory to this small station, because ASCAP has a license that would have and that ASCAP should have used to accommodate this station that would cost approx $240 upto $340/yr. This license is one where ASCAP provides a 'blank license' as a flat fee to stations, but in such a license the station is responsible for payments and providing reports (which the KRS provides when a customer signs up with them—so the customer does not have to do so). This requirement also does not allow for how the station will accommodate this and at the same time be in compliance requirements for the other PROs—because there is more than one PRO, and this music player is one for a single website—that KRS provides for it to use.—This requirement is in detriment now and then and should be viewed and revised as estoppel and unjust enrichment for any additional payments.

63. The Plt was required to spend time and nearly 50 or more E-mails trying to resolve this for the small station, and Def 2 (ASCAP's digital media representative) continued to require the small station to pay them this approx $2,000 after KRS notified them by E-mail of how the small had signed up with them, and that it really would be no different and less costly for the station if ASCAP would provide its 'GoDirect license' for the station—but this was all to no avail and to ASCAP harassing, threatening the Plt with default, stressing the Plt (and the station) demanding that they pay it, and requiring the Plt to collect the $2,000 from the small station and send the payment to ASCAP or KRS's other stations would also suffer when KRS would be (by ASCAP's term in default)—something that would be detrimental to the Plt and the stations (who would be without licensing for the songs). This requirement continues today in the KRS agreement with ASCAP—and they refuse to discuss it—and should be estoppel from requiring it. **Causes of action**: *Unjust enrichment and estoppel*, lack of good-faith and bad-faith to the contract.

64. ASCAP (Def 2) interpreted and continued to use the PRONETLicensing agreement and its definitions to mean something that it was not. Among other things saying and interpreting the agreement to mean: (1) any PRONETLicensing music players and a station's listings in nonPRONETLicensing music directories (sort of yellow pages on-line) required an additional payment or (2) to force the station to not use PRONETLicensing service at all when they had added their station to these online directories—causing KRS to lose customer and revenue.

**Causes of action:** Unconscionable terms, breach of covenant of good faith and fair dealings

### ASCAP required stations to pay extra for 'yellow page directory' listing

65. This was to be an added costs to stations and to KRS for its PRONETLicensing service, but Plt informed Def 2 that what he proposed would be duplicate fees for the station—because the stations's songs were being tracked already for each station's usage and any 'yellow page' sort of directory as this was would be duplicative payment, and that ASCAP should not require it.

66. Later in 2015 to 2017 the Plt because of the *problems and delays* in getting the agreement completed, the adamancy of Def 2 (in his official capacity) to the content and interpretation of the proposed licensing and also that ASCAP was not doing so expeditiously, included Paul Williams ("PW", Def 5"), who is on their website as the ASCAP CEO in the correspondence to Def 2—see charges below for Def 5    PW (Def 5) the ASCAP CEO never replied to the Plt's E-mail, and it seems Adam Bauer (Def 2) and Defendants 4 actually deleted the CEO from the replies they sent to KRS, although the Plt had included Def 5 (CEO) in them—more of Def 2's lack of good faith and bad –faith for the agreement and negotiations of the it and fraud. **Causes of action**: *Unconscionable terms, breach of covenant of good faith and fair dealings, fraud*
**Jan 2016**

**Settlement Demand Letter For Plt's 2015 Loss**

67.  In Jan 2016 because of ASCAP requesting payment that included a per customer (affiliate) fee KRS sent ASCAP a settlement demand letter for $50,000 to request compensation for the 2015 loss, the closing of stations and for having to inform customers to not play ASCAP songs since Dec 10, 2015., and stressing, humiliating, and harassing the Plt for almost a year on the agreement and in KRS's request for a license with ASCAP.  Their reply to this demand letter request was as in **E-mail between the digital representative (Def 4) 12-07-2015 and 01–13-2016** *see Exhibits* requesting that the Plt sign a release of ASCAP's liability for it, and also refusing a lower rate for the license.  After several E-mails on this and the Plt's reply requesting changes to the release that excluded a waiver of the right to legal remedies (*see Exhibits*) the last E-mail on the release that the Plt has, and in filing this Complaint the Plt does not see that a release was signed by either KRS or ASCAP or the settlement demand letter KRS sent on its 2015 loss—and ASCAP has not to date sent any compensation on the requested $50,000 for the losst.  As best the Plt can tell ASCAP accepted the check Jan 2016 KRS sent to them with the settlement demand letter, but neither signed such a release, and any such release then or now should be accompanied by the Plt's non-waiver of KRS's legal rights and actions to their failures of the law and the agreement, and to filing this Complaint.

68.  Using the **01-13-2015** E-mail the Plt had revenue for the year of $*132,009.11*, and the rate was to be 5% of it.  The delay in completing the licensing agreement for KRS is no more than ASCAP's *fraud and lack of good-faith and fair dealings*, and ultimately would put the Plt out of business and to have their customers come to them instead of a service such as that KRS provides with PRONETLicensing.  One of the ways this is evidence of their failures and averments is that ASCAP explicitly say they are discounting the cost to the Plt 25% on their regular licensing, but they also proposed in their 2015 – 2016 agreement (which Plt disagrees

with) was to limit the number of songs and usage that KRS could provide to its customers, and

this was also so customers would go to ASCAP to buy it instead of to KRS. Thus the Plt would

also lose the customer and the revenue. Causes of action: *Breach of contract, delay, bad-faith,*

*lack of good-faith, unconscionable dealings, fraud to negotiations, and fraud to price fixing.*

69.   These E-mails are evidence of ASCAP's delay (in violation if more than 60 days by the
ASCAP decree), *lack of good faith and bad faith to the agreement that* neither came later and
didn't happened at all in 2015. ASCAP would be in violation of the ASCAP decree consent: (1)
which they promised to abide by but in their failures to abide by it for timeliness, (2) provide
licensing to anyone who requests it—*see Consent Decree Section V. Through-to-the-Audience
Licenses{ TA \l "V. Through-to-the-Audience Licenses" \s "V. Through-to-the-Audience
Licenses" \c 3 }.* ASCAP is hereby ordered and directed to issue, upon request, a through-to-the-
audience license to a broadcaster, an on-line user, a background/foreground music service, and
an operator of any yet-to-be-developed technology that transmits content to other music users with
whom it has an economic relationship relating to that content, and (3) fairness of rate provided to
those requesting licensing, and   (4) ASCAO incorrectly project in their communication with the
Plt that their negotiations were appropriate, but they were not--especially when the Plt notified
them of the legal loopholes in their now late and  proposed 2015 licensing agreement, their
misinterpretations of the sections of the agreement that the Plt asked them to include and make
changes to for *see p. Section.* VIII(A) of the final KRS 2016 agreement. **Causes of actions**:
*Breach of verbal and written contract, bad-faith, lack of good-faith, price fixing,
unconscionable negotiations, duress, coercion, fraud.*

70.   **COUNT V.**  Additional Violations of ASCAP Consent Decree of 2001

71.   Breach of verbal and written contract, bad-faith, lack of good-faith, price fixing,

unconscionable negotiations, duress, coercion, fraud, negligence.

72. The Defendants including Def 4 and his E-mails that what ASCAP proposed and provided to
KRS was to that of a similarly situated service. As best the Plt can tell that similarly situated
service would be *RCI* who the PRONETLicensing service would be modeled after using the 5%
of gross revenue rate, and ASCAP says it thinks they nor Def 2 has done anything wrong.
ASCAP eventually can be viewed as not providing and denying the Plt the licensing. This would
be in violation of *see United States of America v. American Society of Composers, Authors and
Publishers.* decree section VI of the consent decree{ TA \l "*United States of America v.
American Society of Composers, Authors and Publishers.* decree section VI of the consent
decree" \s "United States of America v. American Society of Composers, Authors and
Publishers. decree section VI of the consent decree" \c 3 }, '…**Licensing.** ASCAP is hereby
ordered and directed to grant to any music user making a written request therefore a non-exclusive
license to perform all of the works in the ASCAP repertory …."They don't have to pay what
ASCAP wants. If there is a disagreement, they [one requesting a license] can then go to the "rate
court" under section IX, under which ASCAP has the burden of proof.. *See 2001 Decree* :

"...(B). ASCAP is also prohibited ... ASCAP from discriminating among similarly situated licensees ...ASCAP Decree §§ IV(C){ TA \l "*See 2001 Decree* : \"...(B). ASCAP is also prohibited ... ASCAP from discriminating among similarly situated licensees ...ASCAP Decree §§ IV(C)" \s "See 2001 Decree : \"...(B). ASCAP is also prohibited ... ASCAP from discriminating among similarly situated licensees ...ASCAP Decree §§ IV(C)" \c 3 }...."

73. But if ASCAP refuses to admit their failures and says their failure is justified on

similarly situation services of RC1.  But that basis alone has legal violations and problems,

because: *(1)* Def 1 in 2015 viewed the Plt's website's existing prices then based its own pricing

on it to within approx $4 or $5 (proposing that KRS pay $15-$18 per customer per month) of

what would be left out of the $23.50 for the plans the Plt had on the websites.  *(2)* ASCAP also

proposed that the Plt should and could not service customers who had more than 7,000 ATH

usages monthly.  This is detrimental to KRS's monthly incoming revenue—destroying their

customer base with both options for the licensing.  *(3)* ASCAP also suggests that the ASCAP

decree allows them to provide the handling of negotiations for the agreement and to the delay in

completing the Plt's request for licensing with ASCAP and for the agreement, which they are

again in violation of the 2001 consent decree (2001-is the one they provided to the Plt) and *the*

*Sherman Act would be another violation.  (4)* Defendants never provided the Plt with who the

other similarly situated services were—but  the Plt thinks it is RC1 whose service they also

would cause a loss to with their proposed rate and negotiations or the lack there of and also to

that of lack of good-faith or to  whom KRS was to be modelled after based on 5% of gross

revenue monthly.

74. The Plt thinks there were none except the pricing and intellectual property pricing KRS PRONETLicensing website.  If ASCAP compared the PRONETLicensing offered agreement to RC1 (see above) they also would be *destroying the customer base of both services (including PRONETLicensing), the Plt's and the modeled service—diminishing KRS's  competition and revenue, and customers*.  See Def 6 (PFA - Kevin Goldberg) E-mail **03-13-2015** 705pm: "...But I think it's worth figuring out what "affiliate services" they're [ASCAP] comparing you to. [Is it another redacted company ]?  That's a completely different realm and maybe that's what they don't understand... Maybe ASCAP is fine with losing you [Redacted company] and your

clients. I'd be sorry to see that happen after all we've done and just after [KRS] started operations but I think it would be the only move…"

75. So this also would be a question for who was the similarly situated service, and a violation for price fixing by the Plt's website prices and in providing a rate to the Plt, and misrepresentations about such a service There was no valid existing service *see supra* price fixing violation. **Causes of actions:** *Breach of verbal and written contract, bad-faith, lack of good-faith, price fixing, unconscionable negotiations, duress, coercion, fraud, negligence.*

76. **COUNT VI.** Violation of Website Intellectual Property/Sherman Act and Price Fixing

77. ASCAP failures to the fee they proposed and provided to KRS continued to have legalities and problems of its own, because: *(1)* Def 1 through Def 2 viewed the Plt's website's existing prices then based its rate on it to within approx $4 or 5 of what would be left out of the existing $23.50 KRS plans on the Plt's website. *(2)* ASCAP failures and violations of the consent decree is that of Defs 1 to Def 3 delayed the KRS 2015 agreement which they accepted after receiving the much needed settlement demand letter the Plt sent to them for the Jan-Dec 9, 2015 payments, when ASCAP (Def 2) causing a loss also for Dec 10, 2015 – Dec 31, 2015 loss and in stations closing late in the year because of ASCAP's actions in their *negligence,* when throughout approx Apr-Dec 2015 the Plt repeatedly asked and reminded ASCAP and Def 2 to Def 3 by E-mail and requested phone calls about the delayed licensing agreement.

78. Instead on these E-mails and phone calls ASCAP: *(1)* ignored, *(2)* did not reply timely, and *(3)* when they did reply threatened the Plt with breach of the license and *(4)* told the Plt that KRS should pay them based on $15-18 per customer for each month of 2015—now almost a year of payments. Nonetheless if the Plt had agreed to such a required ASCAP monthly fee per customer the fee had not been invoiced or paid to the Plt by KRS customers—because ASCAP

delay and its *unconscionable and unfairness to that of its business and trade practices* on the fee,

*(5)* ASCAP's delay also caused the Plt to essentially service just existing customers without

adding any new customers from at least Apr– Dec 2015 because of the licensing negotiations or

the lack there of to what was to be included— thus more of the loss to KRS.  At the same time

stressing and harassing, and humiliation for the Plt.  In addition ASCAP threatened the Plt with

default although they had delayed the licensing agreement and said Plt's customers were not

covered, and this was as late as o/a Dec 10, 2015—causing the Plt to notify its customers to

effective immediately not play ASCAP songs—more of a loss to the Plt and their customers.

79.   **Causes of actions:**  *Threatening the Plt, unconscionable negotiations, breach of contract*

*(verbal and  agreement), breach of contract to good-faith and fair dealings to contract*

*negotiations, and  bad-faith, price fixing using Plt's website prices to provide a price—who this*

*pricing belonged to KRS not ASCAP.*

### COUNT VII. ASCAP's Failures Continued Into 2016 - Higher Rates and Per Customer Fee

80.   This non-license agreement problem continued into Jan 2016 with Def 2's same conduct
and doing the same thing and stations closed, remained closed and did not renew with
PRONETLicensing in the new year Jan 2016.  One reason the customers indicated was that KRS
did not have an ASCAP agreement for them to play songs, and that ASCAP had abandoned them
and KRS.  If stations had renewed it would be at an increasing unaffordable high rate for stations
who had in 2014 and 2015 paid just $23.50 per month (for this for all of the PROs including
payments KRS made for ASCAP), but the proposed new ASCAP 2015 license requested $15-
$18 and the payment of additionally when their usage exceeded a certain amount, that overage
alone would be astronomical monthly for a station who had high usage—plus prejudiced KRS to
providing the higher plans to its customers at all—price fixing and destroying the KRS business
clientele.

81.   No station could broadcast at such a high rate.  The *Plt  in 2016 repeatedly by E-mails*

*informed* Def 1 (through Def 2) of this including sending copies to the ASCAP attorney (**WJ Def**

**5**) who instead of intervening in the matter replied that Def 2 had done no wrong, and also in *see*

*E-mail 06-30-2015-729pm* threatened the Plt to not contact him again unless the Plt was going to

sign the agreement. This also was *duress and coercion* to the Plt's simple request to view the agreement and discuss its terms. WJ, Def 5, indicated he did not see that Def 2 had done anything wrong. But indeed Def 2's and ASCAP had several failures to that now of threatening the Plt on contacting him and to duress to signing of a contract and of the *2001 ASCAP decree* to among other things *breach of contract to good-faith and fair dealings to contract negotiations, and bad-faith to negotiations*. ASCAP's failures now included Stressing, harassing, and humiliating the Plt on the request for licensing.

82.  The Plt repeatedly requested from **Apr to Nov 2016** by E-mail and phone and included Def 3 to Def 5 in them about the failures of Def 1 and Def 2. But this was to no avail. ASCAP's actions caused the Plt's 2015 and now 2016 loss of stations closing and monthly income for KRS, having time spent communicating with ASCAP or trying to get a reply on how to resolve the licensing agreement and get it signed—which they continued to do and also did so through June 30, 2016 and upto July 7, 2016 as below. *See ASCAP Articles of Association of the American Society* of composers, Authors And Publishers (As Amended Through May 2002) *see Section 1*.... (e) To abolish abuses and unfair practices and methods in connection with the reproduction of musical works; (f) To promote and foster by all lawful means the interest of composers, authors and publishers of musical works...."

83.  Ultimately ASCAP failures were in at least one of these to that of abuses and unfair practice for the KRS licensing to the actions of pricing fixing for the agreement, their delay in providing it, and that to were to abide by all lawful means including no more than 60 days to provide the license KRS requested—which they failed to do. **Causes of actions:** *Stressing, harassing, humiliating, threatening the Plt ranging from KRS price fixing, saying KRS was in default of any agreement ultimately signed, to providing no agreement to KRS, and also not doing so for almost a year—then requiring more monetarily than was required, and in ASCAP's, unconscionable negotiations, breach of contract (verbal and agreement), breach of contract to good-faith and fair dealings to contract negotiations, and bad-faith, price fixing using Plt's website prices, duress.*

**COUNT VIII.** 2016 Failures of ASCAP to Add the Agreement Addendum the Plt Requested
84. After several months of this and since these negotiations and lack of good-faith to them, and bad faith to negotiations since Jan 2016 in **Jul 2016** Def 1 through Def 2 finally provided an agreement to the Plt that excluded some of the higher per customer rate. The Plt's licensing would be by them a new media service provided for in the *see ASCAP September 19, 2014 Compendium of ASCAP Rules and Regulations, and Policies Supplemental to the Articles of Association 1.12.9 New Media Transmission Definitions.* (i) a digital audio transmission that, in addition to requiring a public performance license, also requires the Music User to comply with the license requirements of 17 U.S.C. §114, §115 and/or §106(1).... [and] (b) A "New Media Service{ TA \I "17 U.S.C. §114, §115 and/or §106(1).... [and] (b) A \"New Media Service" \s "17 U.S.C. §114, §115 and/or §106(1).... [and] (b) A \"New Media Service" \c 2 }" shall mean any standalone offering by a "Music User" (including, without limitation, by any "On-line Music User") by which a New Media Transmission of musical compositions is made available or accessible (i) exclusively by means of the Internet, a wireless mobile telecommunications network, and/or a computer network and (ii) to the public, whether or not, in exchange for a subscription fee, other fee or charge; and whether or not such offering includes exposure to advertisements before, during and/or after the transmission of such compositions....." Upon receiving this agreement the Plt felt the agreement was a possibility as agreeable for the KRS's customers and maybe could sign the agreement.

85. Plt contacted Plt's attorney Kevin Goldberg of Fletcher (Def 6).  This is the attorney who had provided ASCAP with the letter on beginning the 2015 PRONETLicensing service.  But when the *Def 6 replied he refused to* review the agreement for KRS (although he had said the Plt was and should and would contact him to review and the Plt sign any such agreement when there was 'something' agreeable to KRS with ASCAP).  This virtually left KRS in a predicament for completing the licensing agreement—now that KRS had one that was agreeable.  KRS had by now loss Jan to Jun 2016 customers and revenue from those customers to ASCAP's among other things negligence.

86. Using Def' 6's advice provided earlier the Plt (KRS) requested that ASCAP include an addendum it had drafted for the agreement indicating they were following the advice as previously informed of by Def 6 to complete the licensing agreement and that KRS wished to have the addendum included and would sign the agreement—the Plt also discussed this with ASCAP as part of the negotiations.  Instead ASCAP refused to add the addendum, *coerced, and*

*in duress required the Plt to sign the agreement without the addendum*, and threatened the Plt

that no addendum would be added, and that if the Plt wanted any agreement with them it would

be without the addendum. See addendum that Plt sent to ASCAP..

87. Their attorney WJ Def 3 (*see below* violations and charges against WJ) also sent KRS threats in his E-mails in reply to Def 2's request to add the addendum saying: 'That if [KRS] wanted the agreement *it would be without the addendum and that KRS should not contact him or ASCAP anymore about the license without doing so*—in fact demanding, *forcing, and coercing* the Plt to sign the license agreement without the addendum if KRS wanted a license with ASCAP for its customers—which of course by now the customers needed and without ASCAP they also were without licensing by KRS (PRONETLicensing). The Plt replied by E-mail to Def 3 WJ (ASCAP's attorney) asking that they not send such threats and harassment E-mails, because KRS really just wanted: *(1)* to see what the problem was with the licensing agreement, *(2)* to get one completed for the PRONETLicensing customers and *(3)* to be compensated for the loss they had in 2015, which was attributed to ASCAP's much delayed to and the negotiating of or 'lack thereof' for the licensing KRS had requested.

88. The Plt in *protest and duress signed the existing July 2016* agreement based on a lesser per

broadcaster monthly rate—to which this Compl also address as a separate charge and violation

including *duress and unconscionable negotiations* of contract that was harassing, stressing,

humiliating, and ASCAP's threatening to that of default—the Plt. *Causes of actions:*

*Unconscionable negotiations, breach of contract (verbal agreement), breach of contract to*

*good-faith and fair dealings, bad-faith, coercion and duress to contract and negotiation of it.*

2017

(The Plt's Existing KRS agreement with ASCAP has problems and also is in disarray and should

have an injunction to resolve sections in that agreement)

89.   **COUNT IX.** Estoppel and Unjust Enrichment for ASCAP Forcing Small Station Forced
to Pay Them

90.   ASCAP and Def 2 continued similar conduct in 2017. The Plt continued to request that ASCAP review the PRONETLicensing agreement, because the Plt found it to be noncompliant for customer stations who did not want to play ASCAP music, but ASCAP also replied to KRS that it had evidence the station had indeed played ASCAP songs—to which the station (not identified in this Compl for privacy reasons) indicated by reply they did not think they had played ASCAP songs and requested a list of those songs. Def 2 did not provide any and

continued to require KRS to invoice the station. This would be violation of *see Section X.* "...Public Lists. (A) Within 90 days of entry of this Second Amended Final Judgment, ASCAP shall, upon written request from any music user or prospective music user: (1) Inform that person *whether any work identified by title and writer* is in the ASCAP repertory; or (2) *Make a good faith effort* to do so if identifying information other than title and writer is provided...." Also *see Consent Decree Section IV. Prohibited Conduct.* (C) Entering into, recognizing, enforcing or claiming any rights under any license for rights of public performance which discriminates in license fees or other terms and conditions between licensees similarly situated{ TA \l "*see Consent Decree Section IV. Prohibited Conduct.* (C) Entering into, recognizing, enforcing or claiming any rights under any license for rights of public performance which discriminates in license fees or other terms and conditions between licensees similarly situated" \s "see Consent Decree Section IV. Prohibited Conduct. (C) Entering into, recognizing, enforcing or claiming any rights under any license for rights of public performance which discriminates in license fees or other terms and conditions between licensees sim" \c 3 }....(F) Asserting or exercising any right or power to restrict from public performance by any licensee of ASCAP any work in order to exact additional consideration for the performance thereof, or for the purpose of permitting the fixing or regulating of fees for the recording or transcribing of such work...."

91. ASCAP's requirement for KRS customers to pay monthly broadcaster fees when no

ASCAP songs were played would be *discriminatory and unjust enrichment, and estoppel.* KRS

informed ASCAP (Def 2 and with E-mails to Defs 1 to Def 4) that KRS provided other services

and also a service that allows customers to exclude their stations from the ASCAP licensing

agreement by selecting various services on the Plt's website when they sign up with KRS, which

the Plt told ASCAP they should not be entitled to the monthly fee in the licensing agreement

Although ASCAP claims KRS was provided a similarly situated license—that too would be

*prohibited conduct and fraud* if the station was forced to pay ASCAP when none of their music

was played on the station or when they anticipated it was not, and as such then ASCAP should

provide a way to accommodate any such incidental playing of songs if it occurred—and to

provide to the station and KRS what it anticipated the songs to be or were. But Def2 refused to

provide a resolve for such customers, continuing to *forcing and coercing* KRS to pay the

monthly broadcaster fee (and as below)—Violation of providing the station with their use by *see*

*Consent Decree Section X.* This also would be and causes monthly monetary loss to KRS.

## COUNT II - Unconscionable Terms, Breach of Covenant of Good Faith and Fair Dealings
### ASCAP 04-16-2016 E-Mail
### Required the use and payment of the PRONETLicensing music player

92.   The agreement ASCAP proposed required the Plt's customers to pay a monthly fee to

ASCAP just because they used the music player provides to that of a huge compensation to the

station's website for other PRO requirements (which with PRONETLicensing service is and can

be a separate add-on—therefore a customer is not required to always use the PRONETLicensing

player).  To do this the station merely indicates it is or will not be playing ASCAP songs,

essentially it then is saying it is excluding ASCAP songs when the station broadcasts. **Causes of**

**action:** *Unjust enrichment, estoppel, breach of fair dealngs.*


93.   When the Plt informed ASCAP of this as a customer's add-on option Def 2 outright refused
to allow the Plt's addendum to the final July 2016 agreement that provided for how the music
players to customers should be licensed, when the customer requests not to add this for their
station. **Causes of action:** Unconscionable terms, breach of covenant of good faith and fair
dealings.

### ASCAP required and still does the use of PRONETLicensing music player and payment to
### ASCAP  when the customer does not play ASCAP songs

94. ASCAP also required one of the Plt's small station to pay approx $2,000 for its usage

between **Jul-Dec 2016**.  The station had signed up with PRONETLicensing as a station that did

not and would not play ASCAP songs.  ASCAP (Def 2) when the Plt notified it of the station's

status could have allowed this small station to get a 'GoDirect license' with ASCAP, but didn't.

*see Consent Decree Section IV.  Prohibited Conduct.* Entering into, recognizing, enforcing or

claiming any rights under any license for rights of public performance which discriminates in

license fees or other terms and conditions between licensees similarly situated..."


95. Their requirement for customers to pay monthly broadcaster fees when no ASCAP songs
were played would be *discriminatory and unjust enrichment, and should be estoppel*.  This
payment Def 2 required also was discriminatory to the station, because ASCAP has a license
that would have and they should have used to accommodate the stations that would cost approx
$240 upto $340/year.  This license is one where ASCAP provides a 'blank license' as a flat fee

to stations—but in such a license the station is responsible for payments and providing reports (which using the PRONETLicensing provides this service when a customer signs up with them).

96.    The Plt  was required to spend time and nearly 50 or more E-mails trying to resolve this for

the small station,  and Def 2 (ASCAP's digital media representative) continued to require the

small station to pay them this approx $2,000 after KRS notified them by E-mail of how the small

had signed up with them, and that it really would be no different and less costly for the station if

ASCAP would provide the 'GoDirect license' for the station—but this was all to no avail and to

ASCAP harassing , threatening the Plt with default, stressing the Plt (and the station) on how

best to resolve the matter, and requiring the Plt to collect the $2,000 from the small station and

send it to ASCAP or KRS's other stations would also suffer when KRS would be (by ASCAP's

term in default)—something that would be detrimental to the Plt and the stations (who would be

without coverage for their songs).: **Causes of action:**  *Unjust enrichment and estoppel.*  This

section in the agreement should and must be removed, rewritten or explained to exclude this in

customer invoicing.

97.     ASCAP (Def 2) interpreted and continued to use the PRONETLicensing agreement and its definitions to mean something that it was not.  Among other things saying and interpreting the agreement to mean: *(1)* any PRONETLicensing music players and  a station's listings in nonPRONETLicensing music directories (sort of yellow pages on-line) required an additional payment or *(2)* to force the station to not use PRONETLicensing service at all when they had added their station to these online directories—*causing KRS to lose customer and revenue.* **Causes of action:**  *Unconscionable terms, breach of covenant of good faith and fair dealings, and fraud.* Later in **2015 to 2017** the Plt because of the *problems and delays* in getting the agreement completed, the adamancy of Def 2 (in his official capacity) to the content and interpretation of the proposed licensing and also that ASCAP was not doing so expeditiously, included Paul Williams  ("PW", Def 5"),  who is on their website as the ASCAP CEO in the correspondence to Def 2—see charges below for Def 5    PW (Def 5) the ASCAP CEO never replied to the Plt's E-mail, and it seems Adam Bauer (Def 2) and Defendants 4 actually deleted the CEO from the replies they sent to KRS, although the Plt had included Def 5 (CEO) in them—more of Def 2's lack of good faith and bad –faith for the agreement and negotiations of the it and fraud. **Causes of action:**  *Unconscionable terms, breach of covenant of good faith and fair dealings*

98.     When KRS notified ASCAP and Def 2, serving in his capacity as digital representative,

to review those sections of the July 2016 PRONETLicensing agreement he again continued

through several E-mail replies and refused to both 'review or change' his reply to accommodate

the now non ASCAP enrichment and unjust entitlement to a monthly broadcaster fee to ASCAP

for this type of service provided by KRS to its customers—essentially refusing and saying the

licensing agreement required KRS customers to pay it—when in fact they should not have or had

to pay to ASCAP. Thus, ASCAP informed KRS its stations were required to pay a monthly

broadcaster fee no matter what they wanted of PRONETLicensing if they had a

PRONETLicensing music player—which also is something a station can select to not do—when

selecting a KRS payment plan. *See BROAD. MUSIC v. TAYLOR* 10 Misc.2d 9 (1945){ TA \l

*"BROAD. MUSIC v. TAYLOR* 10 Misc.2d 9 (1945)" \s "BROAD. MUSIC v. TAYLOR 10

Misc.2d 9 (1945)" \c 1 } on another PRO.   "….As BMI knowingly participated in that

misconduct of a fiduciary, it too is liable for the breach of trust. (Irving Trust Co. v. Deutsch, 73

F.2d 121, 123, 125, cert. denied 294 U.S. 708.)…"  This would be fiduciary conduct to the

ASCAP members—and to KRS in its request to ASCAP for the license.

99. ASCAP had and has no entitlement to or  require a station to who does not use or say they

will not use ASCAP music, which ASCAP continued to require KRS stations, but they continue

to do so and requesting it when a station says it does not play ASCAP songs to pay the monthly

broadcaster fee—and  ASCAP coercing and threatening KRS to invoice customers for it, when

ASCAP is not entitled to the payment monthly.  This is also the coercion to the  **Section 8 of the**

**July 2017 ASCAP** PRONETLicensing agreement—which the Plt informed ASCAP of, but Def

2 continued to require it, and threatened KRS with default of the license if they do not send it--

stressing, harassing, and humiliating the Plt with their replies to resolve this section in the

agreement. KRS informed ASCAP (Def 2) that their interpretation of the licensing agreement

and of their request for this monthly fee for such stations was incorrect and requested phone calls

to discuss it—but to no avail, and this was through 2017 and as of the filing of this Complaint.

100.    See a case of another PRO and ASCAP that applies to and opinions what a performance
is. *See UNITED STATES OF AMERICA, et al.  v. BROADCAST MUSIC, INC.,* District Court for
the Southern District of New York Case No. 1:64-cv-3787 citing "....United States v. Armour &
Co., 402 U.S. 673, 682 (1971){ TA \l "*UNITED STATES OF AMERICA, et al.  v. BROADCAST
MUSIC, INC.,* District Court for the Southern District of New York Case No. 1:64-cv-3787
citing \"....United States v. Armour & Co., 402 U.S. 673, 682 (1971)" \s "UNITED STATES OF
AMERICA, et al.  v. BROADCAST MUSIC, INC., District Court for the Southern District of
New York Case No. 1:64-cv-3787 citing \"....United States v. Armour & Co., 402 U.S. 673, 682
(1971)" \c 1 }. As explained above, the plain meaning of "the right of public performance" of a
composition unambiguously refers to a full-work license for that is what is needed to publicly
perform the composition lawfully...." When there is no performance of the songs as requested
by the stations a fee of such ASCAP would not be entitled to and a payment would not apply to a
station who does not play or informs KRS by selecting a plan on the PRONETLicensing website
that the station will not play ASCAP songs. Def 2's (ASCAP's) continued in lack of good faith
and to bad faith to this negotiation and violation of no entitlement to a payment, in so doing
continuing their stressing, harassing, stressing, humiliating, threatening the Plt with default for
KRS and its customers. **Causes of actions**: *Unconscionable negotiations, breach of contract
(verbal agreement), breach of contract to good-faith and fair dealings, bad-faith, coercion and
duress to contract and negotiation of it, and estoppel and unjust enrichment. See UNITED
STATES of America, Plaintiff, v. AMERICAN SOCIETY OF COMPOSERS, AUTHORS AND
PUBLISHERS,* Defendants. In the Matter of the Application of Steve KARMEN, Petitioner, For
an Order Vacating an Award. No. Civ. 13-95(WCC).  United States District Court, S.D. New
York. March 30, 1989. 708 F. Supp. 95 (1989){ TA \l "*UNITED STATES of America, Plaintiff, v.
AMERICAN SOCIETY OF COMPOSERS, AUTHORS AND PUBLISHERS,* Defendants. In the
Matter of the Application of Steve KARMEN, Petitioner, For an Order Vacating an Award. No.
Civ. 13-95(WCC).  United States District Court, S.D. New York. March 30, 1989. 708 F. Supp.
95 (1989)" \s "UNITED STATES of America, Plaintiff, v. AMERICAN SOCIETY OF
COMPOSERS, AUTHORS AND PUBLISHERS, Defendants. In the Matter of the Application
of Steve KARMEN, Petitioner, For an Order Vacating an Award. No. Civ. 13-95(WCC).  United
States District Court, S." \c 1 }...." In *Mount St. Mary's* the court had ordered that the party must
engage in arbitration; here the court merely approved the use of an arbitration procedure by a
private party with that party's overt acceptance. As the court in *Mount St. Mary's* explained: The
simple and ineradicable fact is that voluntary arbitration and compulsory arbitration are
fundamentally different if only because one may, under our system, consent to almost any
restriction upon or deprivation of right, but similar restrictions or deprivations if compelled by
*97 government, must accord with procedural and substantive due process...26 N.Y.2d at 500,
260 N.E.2d at 511, 311 N.Y.S.2d at 867."

**Why Charges Against WJ ASCAP's Attorney Def 3**

101.   **Def 3 (WJ Def 1's attorney)** was at first included in the E-mail cc: that Plt sent along

with Matt DeFilippis ("MD", "Def 4") another employee of ASCAP's digital licensing  The rates

they proposed in Jan 2016 were so much higher that no station could broadcast at such a rate

(since most are hobbyist).  The *Plt repeatedly in E-mails informed* Def 1 (through Def 2) of this

including sending copies to the ASCAP attorney (WJ) who instead of intervening in the matter

replied that Def 2 had done no wrong, and also in *see E-mail 06-30-2015-729pm* threatened the

Plt to not contact him again unless the Plt was going to sign the agreement.

102.   This Def 3 said was because he did not see that Def 2 had done anything improper.  But
indeed Def 2 had among them coercion and duress to signing the license agreement, negligence
to breach of the covenant of good-faith and fair dealings, violation of the 2001 ASCAP 2001
decree as above.  This also was stressing, harassing, humiliation, and threatening actions to Plt
by Def 3.  **Causes of actions**: *Stressing, harassing, threatening the Plt, unconscionable
negligations, breach of contract (verbal and agreement), breach of contract to good-faith and
fair dealings to contract negotiations, and bad-faith, price fixing using Plt's website prices,
duress.  See NY RULEs 1.0. www.dos.ny.gov/info/nycrr.html (Title 22 [Judiciary]; Subtitle B
Courts; Chapter IV Supreme Court; Subchapter E All Departments; Part 1200 Rules of*
103.   *Professional Conduct; § 1200.0 Rules of Professional Conduct) provided by definition
his replies to the Plt essentially agreeing that Defendant 2-5 were correct in among other things
not acting in good-faith and to their negligence.*

104.   **Rule 1.0 (e)** "Confirmed in writing" denotes (i) a writing from the person to the lawyer

confirming that the person has given consent…" (l) "Matter" includes any litigation, judicial or

administrative proceeding, case, claim, application, request for a ruling or other determination,

contract, controversy… authorized to practice law. (n) "Person" includes an individual, a

corporation, an association, a trust, a partnership…. (q) "Reasonable" or "reasonably," when

used in relation to conduct by a lawyer, denotes the conduct of a reasonably prudent and

competent lawyer. When used in the context of conflict of interest determinations, "reasonable

lawyer" denotes a lawyer acting from the perspective of a reasonably prudent…. that the

circumstances are such that the belief is reasonable. (s) "Reasonably should know," when used in

reference to a lawyer, denotes that a lawyer of reasonable prudence and competence would

ascertain the matter in question.... sexual gratification or sexual abuse. (v) "State" includes the

District of Columbia, Puerto Rico, and other federal territories and possessions."

105. **Rule 1.1 (c)** lawyer shall not intentionally: fail to seek the objectives of the client through reasonably available means permitted by law...."

106. **Rule 1.13 of the constituents with whom the lawyer is dealing, the lawyer shall explain** that the lawyer is the lawyer for the organization and not for any of the constituents. (b) If a lawyer for an organization knows that an officer, employee or other person associated with the organization is engaged in action or intends to act refuses to act in a matter related to the representation that (i) is a violation of a legal obligation to the organization or a violation of law that reasonably might be imputed to the organization, and (ii) is likely to result in substantial injury.... (3) referring the matter to higher authority in the organization, including, if warranted by the seriousness of the matter, referral to the highest authority that can act in behalf of the organization as determined by applicable law.... "

107. Rule 4.1. Truthfulness In Statements To Others In the course of representing a client, a

lawyer shall not knowingly make a false statement of fact or law to a third person.

108. Rule 4.1.4 Respect for Rights of Third Persons. In representing a client, a lawyer shall not use means that have no substantial purpose other than to embarrass or harm a third person or use methods...Rule 5.3...Lawyer's Responsibility for Conduct of Nonlawyers (a) A law firm shall ensure that the work of nonlawyers who work for the firm is adequately supervised, as appropriate. A lawyer with direct supervisory authority over a nonlawyer shall adequately supervise the work of the nonlawyer, as appropriate. In either case, the degree of supervision required is that which is reasonable under the circumstances, taking into account factors such as the experience of the person whose work is being supervised, the amount of work involved in a particular matter and the likelihood that ethical problems might arise...."

109. Rule 5.5. Unauthorized Practice of Law (a) A lawyer shall not practice law in a

jurisdiction in violation of the regulation of the legal profession in that jurisdiction. A lawyer

shall not aid a nonlawyer in the unauthorized practice of law...."

110. Rule 8.4. Misconduct. A lawyer or law firm shall not: violate or attempt to violate the Rules of Professional Conduct... honesty, trustworthiness or fitness as a lawyer; (c) engage in conduct involving dishonesty, fraud, deceit or misrepresentation; (d) engage in conduct that is prejudicial to the administration of justice; (e) state or imply an ability: (1) to influence improperly or upon irrelevant grounds any tribunal, legislative body or public official; or to achieve results using means that violate these Rules..."

111.   Rule 8.5. Disciplinary Authority and Choice of Law (a) A lawyer admitted to practice in this state is subject to the disciplinary authority of this state, regardless of where the lawyer's conduct occurs.

### Why Charges Against ASCAP Matt Defilippis ("MD", "Def 4")

112.   Def 3 (WJ Def 1's attorney) was at first included in the E-mail cc: along with Matt DeFilippis ("MD", "Def 4") another employee of ASCAP digital licensing.  He was the initial reply to the **Dec 2015** loss (*for the 2015 agreement*) and the Jan 2016 settlement demand letter for it in the amount of $50,000 for the Plt's loss.

113.   He also sent the Plt the release for the loss, but it was not signed by either ASCAP or KRS, because the Plt's reply to it was that it required waivering legal action.

### Why Charges Against ASCAP Paul Williams ("PW", "Def 5")

114. Def 5 was included in the E-mail cc: to the other executives at ASCAP digital licensing. Def 5 did not at any time reply to the Plt, discuss or contact the Plt in reply to Plt's request for him to intervene, but he was included in the E-mails about the problem the Plt was having in both acquiring the licensing, its delay, and later on its interpretation about stations to be excluded from the monthly broadcast fee when they do not play ASCAP songs—thus on the *estoppel and unjust enrichment* and negligence actions.

115. It would be reasonable for the Plt to expect that the Def 5 ( the CEO) would intervene and have either Def 2 (digital media representative for licensing) or Def 3 (ASCAP attorney) determine and correct the problem—thus also this is Def 5's *negligence* and his allowing Def 2-4 to continue in the manner they did for the license between *Jan 2015- Dec 2015* and *Jan 2016 – Jul 2016*, and its interpretation of payments due or what was required when ASCAP were not entitled to these payments by stations who chose not to play ASCAP music.

### Summary of Inclusive Charges Actions Against ASCAP

1.          Sherman Act Section 1, U.S.C. § 1.; *(2)* Violation of ASCAP decree - Allows the

performance of ASCAP music and licensing to anyone who asks.; *(3)* Negligence; *(4)* Estoppel;

*(5)* Prohibited conduct; *(6)* Price fixing or permitting fees for such; *(7)* Issuing and receiving

payments based on no music ASCAP played; *(8)* Incidental usage instead of continual playing of

songs; *(9)* Notify within 60 days of music user's written request by ASCAP decree; *(10)*

Reasonableness of rate fees and/or similarly situated services-there were none ASCAP just

provided the fee based on the KRS website prices; *(11)* Intellectual property violations; *(12)*

Price fixing; *(13)* Threatening breach of 2016 for small station to pay almost $2,000/when no

existing ASCAP license is that much and could have provided the station with its $240 or $340

blanket license; *(14)* Unconscionable negotiations for KRS request for the license and its

interpretation; *(15)* Breach of contract (verbal and written) and to that of good-faith and fair

dealings; *(16)* Coerced to sign and duress to signing Jul 2016 licensing agreement .

### Additional violations of the law in the Existing 07-07-2016 agreement

116.   This agreement in this lawsuit was signed by coercion and duress is violation of the law
to that of contract law.  The Plt repeatedly sent E-mails and more than one phone call to
Defendants 1-5 about this agreement they finally after more than a year proposed to the Plt, but
did so by coercing and in duress for the Plt to sign it. Their attorney Defendant 3 also threatened
the Plt to sign it when the Plt contacted him about the problem she was having with ASCAP and
the Media Director for New Media Defendant 2 pertaining to the agreement and sections in it
that should be corrected.

### Jurisdiction of the ASCAP Board of Review for Plt's Agreements

117.   According to Rule 1.1 In accordance with Article XIV, Section 4 of ASCAP's Articles of

Association, the jurisdiction of the Board of Review is limited only to complaints from any

member who believes the Society has not made proper distribution of royalties to him, her or it

in accordance with the rules and regulations adopted by the Board of Directors governing

distribution of royalties.—So the ASCAP board of review would not provide determinations on

the violations in this lawsuit, thus the Plt's remedy is in a court of law.  The Rules of Association

(2002), the ASCAP Board of Review adopted the following Rules of Procedure by resolution dated January 7, 2006. These Rules supersede the Rules of Procedure of the Board of Review adopted in February, 1961. *See UNITED STATES of America, Plaintiff, v. AMERICAN SOCIETY OF COMPOSERS, AUTHORS AND PUBLISHERS, et al., Defendants. In the Matter of the Protest of Richard Lewis Warren.* No. CIV. A. 41-1395 (WCC). United States District Court, S.D. New York. January 31, 2001…. "….ASCAP member Richard Lewis Warren filed a Protest in January 1998 before the Board of Review (the "Board") pursuant to the internal grievance procedures set forth in the Articles of Association and the 1960 Order."

118.    ASCAP Defendants 1-5 also might entertain the defense that they are 'looking out for the interests' of their members in the rate they provided to the Plt, but the rate ultimately was provided that the Plt felt was agreeable—but that was not timely and done at the hands of Defendants1-5, and also in the manner in which the Defendants provided it—was a failure by them to that of the 2001 Consent Decree. They also these failures incurred financial revenue to its members and a loss to the Plt when their business venture could not service its customers to play ASCAP music repertoire.  It is clear by the Defendants 1-5 replies to thePlt that ASCAP did not follow the consent decree, common law or statutory law including that of a standard of review to contract law, negotiations, and good-faith and were negligent.

119.    **Breach of Article 8. Indemnification; Limitation of Liability.** 8.1 ASCAP Indemnification. (a) ASCAP agrees to defend and handle at its own cost and expense any demand, claim or action against Licensee, its officers, directors, employees, representatives, and agents (each a "Licensee Indemnitee") based upon or in connection with any demand, claim or action by a third party arising out of any actual or alleged breach of ASCAP's representations and warranties contained in this Agreement. ASCAP agrees to indemnify and hold the Licensee Indemnitees harmless from and against any and all liabilities, losses, damages, costs and expenses (including reasonable attorneys' fees) associated with any such demand, claim or action.—**Small station to pay them approx. $2,000 for the year when a godirect station with ASCAP pays no more than $240-$340/yr.** -- ASCAP exhibited negligence, bad faith and lack of good faith to negotiation, harassing, stressing, humiliating the Plt in regard to the station when Plt requested they allow the station to pay the lesser amount.

120.   **Breach of Article 8. Indemnification; Limitation of Liability.** 8.1 ASCAP

(c)…however, that (i) that no settlement or compromise affecting the financial or legal

obligations of any Licensee Indemnitee shall be entered into or agreed to without the applicable

Licensee Indemnitee's prior approval and unless such settlement contains an unconditional

release by the claimant or the plaintiff of the Licensee Indemnitee, its officers, directors,

employees…. ASCAP exhibited negligence, bad faith and lack of good faith to negotiation,

harassing, stressing, humiliating the Plt in regard to Plt's requests for a settlement of her 2015

loss then into 2016 they ignored her requests for licensing, causing her to lose customers both

from Jan 2015 to 2016 when they at her continued questioning of them for the licensing provided

a rate to the Plt.

121.   **Breach of Article 8. Indemnification; Limitation of Liability.** 8.2 Licensee
Indemnification. Licensee agrees to defend and handle at its own cost and expense any demand,
claim or action against ASCAP, its respective officers, directors, employees, representatives, and
agents (each an "ASCAP Indemnitee") based…--The Plt did not agree to this as a resolve to the
agreement—and the agreement should be void when the Plt asked to have her addendum of what
were legal concerns attached to the agreement—which the vehemently refused and in duress and
coercion forced the Plt to sign the agreement without it.—The 07-07-2016 agreement should be
held void and the Plt allowed punitive and damages for ASCAP's failures.
122.   **Breach of Article** 9.8. Arbitration. Any dispute arising out of or related to this

123.   Agreement shall be subject to final binding arbitration between the Parties as provided
herein. The arbitration shall be conducted pursuant to the JAMS Comprehensive Arbitration
Rules and Procedures in effect at the time the request for arbitration is made (the "Arbitration
Rules"), and in accordance with the Expedited… Procedures in those Arbitration Rules,
including Rules 16.1 and 16.2 of those Arbitration Rules, except as modified herein. The
arbitration shall take place in New York, New York before a single neutral arbitrator (the
"Arbitrator") s elected in accordance with the Arbitration Rules. Each Party shall pay its own
costs.…—The Plt maintains that if such an arbitration were held it would be when Defendants 1-
5 exhibited good-faith and conscionable means to the agreement which they failed to do, and that
should bar and void such an entitlement to arbitration—thus the filing of this lawsuit to a court is
proper.

124.   **Breach of Article  9.10. Independent Legal Advice.** Each of the Parties has received

independent legal advice concerning both the nature of this Agreement and their legal rights and

obligations pursuant to this Agreement. The Parties have entered into this Agreement voluntarily

and of their own free will and accord without any threat of force or duress of any kind.—Indeed

ASCAP forced the Plt in both duress and coercion to the signing of the agreement, and ignored

the addendum requested to be added about the improprieties of various sections of the

agreements as in this complaint.  – This actually is a section that should be removed from the

agreement as unconscionable to that of even asking the Plt agreeing to have received

independent legal advice.  The Plt maintains that Defendants 1-5  failed to  exhibit good-faith

and conscionable and to that of contract law means their actions should bar and void this section

This breach also leads to the violations and averments against **Defendant 6 and Fletcher law**

**firm**.

125.   **Breach of Article  9.7. Amendment; Waiver; Severability.** This Agreement may not be
amended, modified or terminated except by a written instrument signed by both of the Parties.
No failure or delay by either Party to exercise any right or enforce any obligation shall impair or
be construed as a waiver or on-going waiver of that undertaking, or obligation of either Party. If
any term, covenant or condition of this Agreement is held invalid, illegal or unenforceable in any
respect, such provision shall be replaced by an enforceable provision that most closely meets the
commercial intent of the Parties, and such holding shall not affect any other provision of this
Agreement, which shall be and remain effective as though such invalid, illegal or unenforceable
provision had not been contained herein.-- ....—The Plt maintains that if such an arbitration were
held it would be when Defendants 1-5 exhibited good-faith and conscionable means to the
agreement which they failed to do, and that should bar and void such an entitlement to
arbitration—thus the filing of this lawsuit to a court is proper.

126.   **Breach of Article**  9.12. Further Assurances. Each of the Parties hereto shall take such

further actions and execute and deliver such additional documents and instruments consistent

herewith as may be reasonably required in order to effectuate and/or implement the purposes and

intentions of this Agreement. ....—The Plt maintains that ASCAP and Defendants 1-5 continued

in their improprieties to lack of good-faith and by unconscionable means to the agreement were

their failures—and they did so after and ignored the Plt after the Plt brought this to their attention in her numerous E-mails, phone calls, and requests about sections of the agreement. This also bars and voids such defenses to as contract to arbitration or their responsibility and negligence, thus the filing of this lawsuit to a court is the proper remedy.

127.    **Breach of Compendium of ASCAP Rules and Regulations, and Policies Supplemental to the Articles of Association pp. 27-28...3.5 Crediting Works of Foreign Origination.** 3.5.1 Definition of a Work of Foreign Origination. A work which has a "Foreign Origination" shall mean any work in which: (a) The writers and publishers are all members of foreign affiliated societies who have elected to license their works through ASCAP in the United States; or, (b) A writer is a member of a foreign affiliated society, and that writer's publisher is a Member of ASCAP and is the publisher of the work in the United States in accordance with the provisions of a Sub-publisher agreement with a publisher who is a member of a foreign affiliated society; or, (c) A Writer is a Member of ASCAP, and that Writer's publisher is a member of an affiliated foreign performing rights organization...."

128.    Breach of Compendium of ASCAP Rules and Regulations **3.8 Application of Royalties to Repay** Amounts Due ASCAP. (a) To the extent that a writer or publisher member receives royalties to which the member was not entitled, or otherwise owes any debt to ASCAP, ASCAP has the right to recoup such royalties or debt from all royalties earned by that membership, and ASCAP's exercise of that right shall not constitute a waiver...."

### Additional violations against Fletcher Law firm and ASCAP
### Charges Against Def 6 Kevin Goldberg and His Fletcher Law Firm

129.    On 04-15-2015 515pm Def 6 sent an E-mails: "....I'm checking in again to see if either of you have heard from ASCAP or BMI. I have suspended my own outreach to either organization based on Kathy's request that I be mindful of her desire to keep legal expenses at a minimum....[and] 04-16-2015 12:18pm]"....I'm happy to reach out to ASCAP and BMI any time you would like.  As I said in my last Email, you made it clear to me that you were concerned about legal fees.... They [PROs including ASCAP] would never do anything other

than to work to get the highest possible rate for that client....[and] 04-16-2015 236pm "....That requires taking into account whether they [ASCAP] can, at some point, turn away businesses (like you...) and, by doing so, turn away revenues....." Essentially Def 6 is saying ASCAP is not requiring this for competitiveness just for more revenue for ASCAP—violation to unfair business and trade practices by ASCAP and to the breach of the covenant of good-faith to fair dealings. 05-12-2017 12:05pm Def 6 sent E-mail: "....Please let me know what, if anything, you need from me regarding this and/or th ...agreement.....**05-12-2015 303pm** Plt replied "...I am asking that you not work on this at all by E-mail or phone for now....**05-12-2015 743pm** Def 6 replied "That's fine. I understand. That's why I asked. I'll await further word...06-04-2015 753pm Plt sent Def 6 E-mail "...I will let you know when ASCAP and BMI, when they reply. We can discuss the rate and your services when I have more, of course you know I'm on a limited budget....**08-05-2015 312pm** Def 6 replied "I am aware of the budget limitations. That's why I will be taking my cues from you....10-14-2015 634pm Def 6 sent E-mail "...I'm just checking in to see if you've made any headway with ASCAP.... I am a bit worried about their Email, not just because there seems to be no real movement toward an agreement but also because they have clearly identified some legal concerns surrounding the existing set up -- the fact that they think several ProNET affiliates are operating in a way that is not allowed under even the proposed licensing agreement/existing [**Redacted Model company**] agreement..... and am hoping you'll allow me to intercede on your behalf to avoid what could be a significant, prolonged and perhaps more expensive process later on...[Essentially this E-mail began what was on the impasse with ASCAP with their saying the Plt and affiliates did not have an agreement]. It also was now almost a year since they began and at least 6 months since the Plt begin directly discussing the agreement concerns with ASCAP—per Def 6's agreement with the Plt to let him know how things transpired] 12-03-2015 621pm Plt sent Def 6 E-mail "...,As you know ... and ASCAP were to discuss their agreements, before getting you in on this again, as a way to lower my cost to your fees. Since you and I spoke on this, both of them were slow to respond and replied at various times in the last few months (which I am not happy about) and saying they were looking at the rates...12-03-2015 630pm Def 6 replied " I look forward to reviewing them when they arrive. Of course, we will have to complete this by the end of the year....[Essentially the Plt was merely telling Def 6 that the 2015 year would be ending in a few weeks—not trying to force Def 6 to complete anything with ASCAP by 2015—but that too would not be enough reason for Def 6 to void the attorney-client engagement—The Plt thinks Def 6 just did not abide by his verbal agreement to view the license when ASCAP provided it— which now was what they were saying would be the Plt's 2015 license with them. Plt sent Def 6 an E-mail 12-11-2015 1213pm "....Considering Adam Bauer's negotiations or lack there of on our 2015 and 2016 agreement I consider his conduct and dealings to have legal loopholes, including as in the attached package among other things are: (1) Lack of good-faith to completing the agreement (2) Pursuing our website for our prices then fixing his music usage rate offer to us based on it (3) Delay in timeliness to complete the agreement (4) Not accommodating all our affiliate plans for no valid or informed reason (5) Trying to close our small virtual business down (6) Trying to acquire our customers for his own use (7) Trying to receive music royalty payments that he is not entitled to receive (8) Requiring and trying to force a two-year agreement when one year had not been accepted (this was because if KRS did not have enough paying customers a two-year agreement would essentially be a monetary loss.) I am sent by E-mail a notice to our PRONETLicensing affiliates (also in the attached package) to refrain from using ASCAP music for the remainder of Dec 2015, but it is not my legal advice,

but suggestion that they do so because of Adam's (ASCAP's) conduct on the PRONETLicensing service we committed to in Jan 1 2015…I think it is best to settle the 2015 agreement by sending the 5% of gross revenue, which we invoiced our affiliates for Jan 1 - Oct 31, 2015, and those invoiced for Nov - Dec 2015 will be sent when we calculate the revenue for them in a couple of weeks.-This is how I see we can best settle Adam's (ASCAP's) dealings on this matter.-We are still open to immediately negotiating a 2016 agreement for our affiliates based on the counter-offer spreadsheet PRONETLicensing sent Adam on 12-10-2015 with our proposed changes to the rates and that would accommodate all of the PRONETLicensing affiliate plans.....Def 6 replied to Plt 12-11-2015  12:16pmAs I said in my earlier Email, I don't think I am the person that can assist you in this  matter. I am happy to find suitable counsel for you…. Def 6 sent an E-mail **12-11-2015** 1247pm "… in part, why I thought our attorney-client relationship is not working and decided to terminate the agreement effective January 1, 2016 as per my letter of December 11, 2015.  Because I don't think I can help you resolve this by the end of the year, I also don't think it's a good idea for me to intervene.  I gave you significant notice in case you needed assistance to find new counsel…."—But in fact he did not provide this until the same day and if he had provided it earlier it was without reason to terminate—and baseless when he should have merely viewed the documents he told the Plt he would do when she sent them to him.— unreasonably he also continued to refuse to finish up his work on the license with ASCAP.**12-17-2015** 810pm Plt sent E-mail to Def 6 "…See attached [For the other PROs]documents. I sent these …yesterday, 12-16-2015, but I told them below what I thought we might change.  They have not replied.  All of my comments can probably be agreed to as … has it, but I wanted to 'redline' them to see if they should be changed…."—This was to be an agreement for another PRO Def 6 included in his retainer—but **12-18-2015 1236pm** Def 6 sent an E-mail ".As I said earlier with regard to ASCAP, because we are terminating the attorney client relationship at the end of the year – and currently have a zero balance with regard to legal fees – I don't want to start new projects at this late date, especially because there is no guarantee that I can complete the work by the end of the year or within the limited amount of time you are willing to pay for. I gave you more than sufficient notice – and an offer of assistance -- to allow you to find new counsel.  The offer to refer you to someone else still stands."—Essentially he made no concession for the other PRO he was to complete for the Plt and also did not send any other attorney he would refer the Plt to—his responsibility to do not do so also would be breach of covenant to good-faith and fair dealings and to what he promised to complete for the retainer." **12-18-2015 204pm** Plt replied "-You did not provide a reason for wanting to terminate the agreement, except for saying I think 'not a good fit', which I hope is not because of my limit and budget, (which would have been depleted by now considering BMI and ASCAP completing it), so I was working on what I said I would do with BMI and ASCAP until an agreement was feasible.-What specifically is the why you asked for the engagement letter we signed to end? 130.    -I am not viewing the engagement letter now, was it to end within a year?-I was thinking

you should at least complete what you started in saying I would get back with you when I had

more/or less as it seems, and of course budget for your fees had to be considered, and you I

thought would review any agreements….**12-18-2015 335pm** Def 6 replied " I have attached a

copy of the engagement letter.  As you can see, it does not make reference to any time frame or

term of existence at all. The reason I need to terminate this agreement is that I do not feel I can

ethically and professionally represent you given the limitations you have placed upon me. I

think it's best if we simply terminate the agreement as soon as possible, allowing you to find new

counsel. I am happy to help you get new counsel up to speed."—Essentially refusing to do

anything about his breach and also did not send any new info for an lawyer—just denying the Plt

his services—saying he would help to get another lawyer—leaving the Plt when he had said the

Plt should contact him—Good faith would have been to notify the Plt in the new year and

resolve his engagement for his services—which were paid for but not completed...[The Plt

continued calling and E-mailing ASCAP into 2016—because although the Plt's customers had

been told to not play ASCAP songs Plt was continually needed it for the PRONETLicensing and

its customers—and continued with Def1-5] On **06-24, 2016 5:27pm** [The Plt continued calling

and E-mailing ASCAP into 2016] On Plt sent an E-mail to Def 6 "...(1) I am with

PRONETLicensing as you know and followed the model Marvin at StreamLicensing had.

ASCAP is just getting us an agreement for 2016. Our affiliates were told not to play their music

until we get one [now since Dec 10, 2015]. (2) I think the agreement will be OK except I had a

few comments about it including 1) jurisdiction for any legal relief, also on 2) a few sentences.

(3) I was to get this to you anyway after I received what was possible in an agreement from

them. (4) My budget is extra low as you know. If I send the agreement and the comments I sent

to ASCAP about it, can you view it and provide your comments then I think I can sign it. (5) One

thing on the agreement is they have taken so long on it and now want us to waive rights to

legalities for their doing it. All said I think it will be OK to sign except in waiving those rights.

If you can view it that would be good, and I can send it to you.... **06-27-2017 1034pm** Def 6

replied "Did you mean to send this to me? It's been more than a year since the last Email

below. In any event, I cannot help you with this. Our attorney client relationship was terminated as of the end of 2015....**06-27-2015 1239pm** Plt replied " 1) I saw no reason at that time for it to end. I replied before you sent the termination that when ASCAP replied with what seemed an agreement I could sign I would let you know. 2) As you said it has been a while, but this is the time that ASCAP has used to reply, and that is another comment in their agreement that I replied to them about. So, that is why I sent this E-mail to you for you view the agreement they sent last week.3) So, is it possible for you to view the agreement they sent and reply to me on the comments I sent to them. You would not be representing PRONETLicensing, nor need to call ASCAP, just that you would be viewing the agreement, then I will reply to them and hopefully get it signed, but again your time spent viewing the agreement they sent and my comments. This would need to be low cost, and probably invoiced or spend much less than an hour on it.

131.    4) You are already familiar with their agreements, so a few sentences in it is what I think we would need for you to view before signing it....Def 6 replied **06-27-2016 412pm** "The answer is still no. I think it's simply best if we do not work together and I gave you ample notice of this so you could find another attorney. I think that is best...."—He essentially is admitting that he has no reason not to view the documents—breach of the covenant of good-faith and fair dealings, and in his retainer and engagement letter invalid termination...**06-27-2017 4:13pm** Plt replied "...(1) As I was saying before I saw no reason for you to say that we should have ended your working on the agreement for PRONETLicensing. That is something you said. (2) I asked to allow me to discuss the agreement with ASCAP because of my budget, which you said to do, and I was to let you know when I thought we had an agreement that we could use. (3) But you later sent an E-mail saying you were going to end the engagement, and that is what you did. I was still in negotiations with ASCAP at the time, that you sent it, and they did not reply with such an agreement until last week, although ASCAP and I have E-mail several times since then. (4) So, I was sending you this E-mail to have you view the agreement, not to do any negotiations, just to view it and my comments to ASCAP on their agreement, then maybe get it signed, but again your viewing it will need to be a small amount of invoiced. (5) That is why I sent the E-mail today, and I'd said would let you know when I received the agreement, and you are familiar with the agreement since doing this with Redacted. (6) If you can just view the agreement and provide comments to me on what I proposed for changes that will be why I incurred about your services to do this. Can you consider viewing the agreement and invoicing on an amount to do this....**06-17-2016 415pm** Def replied "*Again, my answer is no.* That is final."—As you can see he continued to refuse to view or provide his expertise to the Plt—that he might be entitled to do—but not when it was by engagement that his services were incurred and paid for—which he did not finish. This concluded E-mails bout the ASCAP and other PRO

agreements Def 6 engaged into an agreement with the Plt for the PRONETLicensing service. He essentially is admitting that he has no reason not to view the documents—Causes of actions: *Breach of the covenant of good-faith and fair dealings, and breach of contract for engagement*

### Violations and Claims Against Def 6 Kevin Goldberg and the Fletcher Firm

132.   **Def 6: In Nov or Dec 2016** PFA of Fletcher sent KRS an E-mail saying he was terminating the attorney-client relationship and engagement letter with KRS, because he felt they were no longer suitable for this relationship as the Plt's attorney, but he provided no reason or evidence of why he would abruptly do so, after he had told the Plt earlier in 2016 to discuss the agreement with ASCAP, and the PFA was by the Plt considered as still being so, and the attorney to review any final licensing agreement for the Plt to sign.  So essentially he terminated the engagement agreement for no reason and left Plt to continue to finish up what he had started, and this was after the Plt provided to the KRS attorney and repeatedly providing to him that he had said the Plt could discuss and negotiate with ASCAP and inform him when the Plt felt there

was an agreeable license provided to them by ASCAP.  Instead did not do so when the Plt sent

the request to him to continue and finish up the agreement by viewing it as he said he would.

This is violation of the covenant of good-faith and to that of fair dealings.  *Violation of VA*

*Code: § 59.1-200.* **5. Misrepresenting that goods or services** have certain quantities,

characteristics, ingredients, uses, or benefits; **6. Misrepresenting that goods or services are of**

**a particular standard**, quality, grade, style, or model; **8. Advertising goods or services with**

**intent not to sell them as advertised**, or with intent not to sell at the price or upon the terms

advertised. **9. Making false or misleading statements of fact concerning the reasons**

**for,existence of, or amounts of price reductions;10. Misrepresenting that repairs,**

**alterations, modifications**, or serviceshave been performed or parts installed; **13. Using in any**

**contract or lease any liquidated damage clause,** penalty clause, or waiver of defense, or

attempting to collect any liquidated damages or penalties under any clause, waiver, damages, or

penalties that are void or unenforceable under any otherwise applicable laws of the

Commonwealth, or under federal statutes or regulations; 14. Using any other deception, fraud,

false pretense, false promise, or misrepresentation in connection with a consumer transaction.

(also by D.C. Code CPPA and UCC).

133.    Def 6 ended the client-attorney relationship—for no valid reason, nor for what a reasonable person would expect Def 6 to do considering he had said the Plt was to contact him when there was a doable agreement—failure by the engagement letter, negligence, coercion to the client-attorney relationship termination.  Because of this also stressing, harassing, and humiliating the Plt by his actions.

134.    Although PFA occasionally during 2016 send an E-mail to which the Plt replied about the

progress or the lack there of by ASCAP that was no reason for him to terminate the engagement,

and if he did he could have provided her his services when the Plt told him there was an

agreement with ASCAP for him to review—and this was after the 2015 problems about gross

5% percentage of review. He also could have willing sent another attorney to assist the Plt—but

did not.  **Causes of action:** *Breach of Client attorney relationship, breach of fiduciary duty,*

*negligence, attorney malpractice.  See https://openjurist.org/530/f2d/1072/builders-equity-*

*corporation-v-h-hurwitz-frederick-w-berens-inc-o-builders-equity-corporation*  United Cigarette

Machine Co. v. Brown, 119 Va. 813, 825, 89 S.E. 850, 855 (1916) (emphasis added). See also

Tidewater Quarry Co. v. Scott, 105 Va. 160, 161, 52 S.E. 835, 836 (1906). Here, the damages

consist of specific amounts of money paid on certain dates for counsel fees and necessary related

expenses on the lawsuit, carrying charges, a loan-extension fee, a road assessment fee which

Inland Steel had agreed to pay but which the final purchaser would not assume, attorney's fees on

the sale of the land and a small amount of interest paid on a second trust.4 All of these charges

are either fixed or determinable by a mathematical computation, and so fall within the Virginia

definition of 'liquidated damages.

135.    *See 28 U.S.C. § 1332 (1970)*3§ 8--223. Verdict to fix period at which interest begins; judgment for interest.---Except as otherwise provided in § 3--122 of the Uniform Commercial Code, in any action whether on contract or for tort, the jury may allow interest on the sum found by the verdict, or any part thereof, and fix the period at which the interest shall commence. If a verdict be rendered which does not allow interest, the sum thereby found shall bear interest from its date, at the rate as provided in § 6.1--330.10, and judgment shall be entered accordingly. In any suit in equity, or in an action or motion founded on contract, when no jury is impaneled, decree or judgment may be rendered for interest on the principal sum recovered, until such

decree or judgment be paid; and when there is a jury, which allows interest, the judgment shall, in like manner, be for such interest until payment.

### Remedy against Defendant 6

136.    Under 2 Code of Virginia § 8--223 See Doyle & Russell, Inc. v. Welch Pile Driving Corp., 213 Va. 698, 194 S.E.2d 719, 723 (1973); City of Danville v. Chesapeake & Ohio Ry., 34 F.Supp. 620, 636 (W.D.Va.1940).  See violations among them D.C. Consumer Protection Procedures Act (CPPA) and UCC; New York Code

### In Summary

137.    ASCAP through their executives identified in this Compl have among other things acted

in lack of good faith, are estoppel from payment and the continuing requirement for customers

who say they will not play ASCAP music to be required to pay a monthly fee.  They also are

unjustly enriched and not entitled to payments they required KRS to pay, and are not entitled to

certain of the fees they have requested that KRS invoice customers to pay them.

138.    They were among other things negligent, committed fraud, have fraudulently engaged in

prohibited business and trade practices, and in doing so they have compounded the Plt's loss

with their *harassing, stressing, threatening, humiliation* of the Plt by their actions and in

communication with the Plt for the license KRS requested with and for ASCAP including

*unconscionable negotiations, breach of contract (both verbal and written agreement), breach of*

*contract to good-faith and fair dealings, bad-faith, and a  contract by duress.*

139.    Defendant 6 was among other things was negligent and breached the engagement letter. prohibited business and trade practices, and in doing so they have compounded the Plt's loss including that of customers and when he had the chance to help her again and get her customer base on-track he outright refused, plus he left the Plt open to legal actions.

### PRAYER
### Total Compensation and  Damages Requested of Fletcher Firm (Kevin Goldberg) Defendant 6

140.    The Plt incurred a loss at the hands of Kevin Goldberg of Fletcher Firm.  The Plt is requesting a *restitution, and total compensation, damages from* plus attorney fees, costs, punitive and compensatory damages and for any calculations for interest or miscalculations made in tallying the amounts for their failures in the engagement letter for the KRS llicensing with ASCAP for Jan 2015 through June 30, 2016 in the amount of $100,000.00 for terminating the

client-attorney relationship without a valid reason, and to breach of the engagement letter for client-attorney relationship.

141.    Should this court determine this Complaint requires a venue change the Plt requests that all averments against all Defendants be without prejudice, and that the statute of limitations has been met by this filing.

### Total Compensation and Damages Requested of ASCAP

142. The Plt incurred a loss at the hands of ASCAP, its executives and Kevin Goldberg of Fletcher Firm.  The Plt is requesting a *restitution, and total compensation, damages from ASCAP of: $650,000.00* plus private attorney fees, costs, punitive and compensatory damages and for any calculations for interest or miscalculations made in tallying the amounts for their failures in the ASCAP license KRS requested in Jan 2015 and for stressing, harassing, humiliating, and threatening the Plt when the Plt in good-faith contacted and notified them of the license delay.

143. ASCAP's  interpretations of the existing KRS PRONETLicensing agreement contract to

that of *duress and coercion* in license they provided to KRS on July 7, 2016 for the

PRONETLicensing service is also in breach and it should be reviewed and an injunction

provided to at least the sections in that agreement pertaining to ASCAP's requirement for

customer websites and music player restrictions.  This includes the **Dec 10, 2015** loss when

stations were required to not play ASCAP songs, and for the **Jan 2015 – Dec 2015** loss of not

being able to service new customers or have them sign up for the PRONETLicensing service

because of their negligence, delay in providing the request for an ASCAP license and in their

violation of the law  among them statutory for unfair and improper business and trade practices,

and to that of the tort of breach of contract and fair dealings.

### Additional violations against Fletcher Law firm and ASCAP

144.    **Breach of Article  9.10. Independent Legal Advice.** Each of the Parties has received independent legal advice concerning both the nature of this Agreement and their legal rights and obligations pursuant to this Agreement. The Parties have entered into this Agreement voluntarily and of their own free will and accord without any threat of force or duress of any kind.—Indeed ASCAP forced the Plt in both duress and coercion to the signing of the agreement, and ignored the addendum requested to be added about the improprieties of various sections of the agreements as in this complaint. – This actually is a section that should be removed from the agreement as unconscionable to that of the Plt agreeing to have received independent legal advice.

145.   This breach also leads to the violations and averments against Defendant 6 and Fletcher law firm. When the Plt contacted Defendant 6 about the problem ASCAP was causing with the rate fee for the Plt's agreement he ignored that they were requesting this section as early as 2015. Why did he not provide wording that does not put the Plt at risk of violating her right to sign a contact without legal advice. There is no common or statutory law in D.C., Virginia, or New York that requires that the Plt accept this in a contract or agreement as this one with ASCAP. It is also unconscionable and should be removed from the agreement.

### Total Compensation and Damages Requested of Fletcher Firm (Kevin Goldberg) Defendant 6

146.   The Plt requests $100,000.00 for terminating the client-attorney relationship without a

valid reason, and to breach of the engagement letter for client-attorney relationship, and his

various other actions exhibited as indicated in this complaint.

### TYPE OF TRIAL REQUESTED

147.   The Plaintiff requests a trial by jury.

148.   Defendants should be held accountable for their actions in negotiating the ASCAP

agreement among them to that of the summary of violations p. 10 (supra) among them price-

fixing and unfair competition and stressing, harassing and humiliating KRS while the Plt

constantly and in good-faith contacted them to inform them of it and their actions to resolve the

requested agreement for their small virtual business entity.

Dated: 12/07/2018
Respectfully submitted,

KRS Processing Inc. (Kathy Allen President)

*Kathy Allen - President*

/s/ Kathy Allen- President
26 55th Street NE
Washington, DC 20019
(202) 396-1225
PRO SE Plaintiff
Small virtual business
KathyAllen@PRONETLicensing.com

1

## CERTIFICATE OF SERVICE

I hereby certify that a copy of this Complaint  was delivered on 12/07/2018 to and that Defendants' and known attorney was notified as below.

By eFile and E-mail (requested):
*Collectively ("Defendants")*
*DEFENDANT 1:*  American Society of Composers,
Authors and Publishers (ASCAP)
*DEFENDANT 2:* Adam Bauer - in official capacity
*DEFENDANT 3:* Wayne Joel - in official capacity
*DEFENDANT 4:* Matt DeFilippis - in official capacity
*DEFENDANT 5:* Paul Williams - in official capacity
Lawyer Defendants 1-5:
Richard H. Reimer, Esq.
Sr. Vice President - Legal
ASCAP 1900 Broadway New York, NY 10023 rreimer@ascap.com

*DEFENDANT 6:* Fletcher and Kevin Goldberg (attorney-client relationship with KRS in official capacity)
1300 17th St North 11th Floor
Arlington VA  22209
Lawyer Defendant 6:
Abby A. Franke, Esq. VSB 87276
ECCLESTON & WOLF
1629 K Street, N.W. Suite 260 Washington, D.C. 20006
T: (202) 857-1696, ext. 1105 E: franke@ewdc.com

Dated: 12/07/2018

*Kathy Allen - President*

/s/ Kathy Allen- President
26 55th Street NE
Washington, DC 20019
(202) 396-1225
PRO SE  Plaintiff
Small virtual business
KathyAllen@PRONETLicensing.com